No. 27,919.

MAME UPDEGRAFF, *Appellant*, v. THE GAGE-HALL CLINIC, G. R.
GAGE, C. W. HALL, W. O. QUIRING and G. J. FOWLER, *Appellees*.

(264 Pac. 1078.)

SYLLABUS BY THE COURT.

1. PHYSICIANS AND SURGEONS—*Malpractice in Administering Anæsthetic—Evidence*. In an action by the wife to recover damages for the death of her husband alleged to have occurred during an operation through the negligent administration of an anæsthetic, the evidence considered and held sufficient to sustain the verdict and judgment.

2. SAME—*Evidence—Propounding Hypothetical Question to Expert*. A hypothetical question propounded to expert medical witnesses examined and held to have fairly summarized the evidence touching the history of the injury sustained by the deceased, his physical condition at the time of the injury, and the method or surgical treatment under the circumstances, and further held that such question was properly formulated to elicit testimony which would be helpful to the jury in determining the controlling issue of fact.

3. SAME—*Evidence—Hypothetical Questions—Province of Jury*. And further, the hypothetical question and the answers thereto did not invade the province of the jury.

4. SAME—*Instructions*. The instructions considered and held to have fairly stated the issues.

5. SAME—*Generally*. Various alleged errors considered and held not to require a reversal.

Appeal from Reno district court; WILLIAM G. FAIRCHILD, judge. Opinion filed March 10, 1928. Affirmed.

*Frank L. Martin* and *James N. Farley,* both of Hutchinson, for the appellant.

*J. D. M. Hamilton,* of Topeka, *C. M. Williams, D. C. Martindell* and *W. D. P. Carey,* all of Hutchinson, for the appellees.

The opinion of the court was delivered by

HOPKINS, J.: The action was one to recover damages for the death of plaintiff's husband alleged to have occurred during an operation through the negligent administration of an anæsthetic. The plaintiff was defeated and appeals.

The plaintiff's husband was seriously injured in his left forearm by being thrown on the sharp edge of a metal casing in a well. The

Appeal and Error, 4 C. J. p. 1130 n. 61.  Evidence, 22 C. J. p. 713 n. 95.
Physicians and Surgeons, 30 Cyc. p. 1587 n. 78.

accident happened about seven o'clock in the evening, some four and one-half miles east of Hutchinson. Plaintiff administered first aid by putting turpentine on the wound and tying it with a bandage. The injured man then drove his car to the defendant's office in Hutchinson where he met one of the doctors who, after calling an associate surgeon, administered a hypodermic of atropine. The patient was taken to a hospital where preparations were made to operate. The operation began at 7:50, was completed at 8:15. Apparently, at the very time the surgeon finished his work of sewing up the wounded parts, the patient died. The surgeon stated to the anæsthetist that he was through, and immediately, almost simultaneously, the anæsthetist said, "He has stopped." Efforts were made to revive the patient. Oxygen was forced into the lungs; artificial respiration was resorted to, but without avail.

The plaintiff contends that the doctors, and especially the anæsthetist, did not make the proper preoperative examination of the patient; that the patient would not have died except for negligence in the administration of the anæsthetic; that a hypothetical question asked of various doctors during the trial did not correctly assume the facts; that the question was wholly unnecessary, invaded the province of the jury, and that the trial court misdirected the jury.

The hypothetical question, which appears to fairly state the facts of the case and to which the objection is made, reads:

"Q. I want to read a question to you, and I would like to read it just once, if your honor please, in the interest of time, so all these doctors may hear it, because I intend to ask them the same question. Doctor Francisco, in answering this question, you will assume the following facts: On the 18th day of June, 1926, a man about 34 years old, five feet and five inches in height, weighing about 165 pounds and in apparent good health, was injured by being thrown forward onto a sharp edge of a metal casing in a well and injured, and was cut on the left arm about midway between the elbow and the wrist; this cut was in the shape of a 'V' with the apex pointing down towards the wrist; the wound was over the ulnar portion of the arm; the sides of the 'V' were about two and a half to three inches long; this accident happened sometime before seven o'clock in the evening at the residence of the injured man about four and a half miles east of Hutchinson; the wife of the injured man administered first aid by putting turpentine on the wound and by applying a bandage; the injured man then drove his car to the office maintained by several physicians in the city of Hutchinson, where he met one of the doctors, who, after calling an associate surgeon, administered a hypodermic of one-fourth of a grain of morphine and 1-150 of a grain of atropine; the surgeon so called went to the office and upon an examination of the injured arm found

that the flexor and extensor muscles had been severed and the ulnar vein had been cut, and a clot had, been organized between the outer edges of the severed muscles and veins; the surgeon advised that the patient be taken to the hospital, and called an anæsthetist to assist him; that when the surgeon and patient arrived at the hospital they met this anæsthetist who had been called; there was a delay of some fifteen to twenty minutes while the operating room was being put in order and the necessary instruments were being sterilized; the anæsthetist was advised of the hypodermic which had been given, and he and also the surgeon made an examination of the patient's heart by placing their ear to the patient's chest, and the anæsthetist also examined the pulse; when the operating room was ready, the anæsthetist started the anæsthetic, using nitrous oxid administered through the use of what is known as the McKesson machine; the surgeon carried out the operation by cleaning the wound and sewing the muscles and tying off the severed veins; the operation was commenced at about 7:50 and completed at about 8:15. During the operation the anæsthetist maintained his position by the patient's head, observing the patient's color, taking his pulse, counting his respirations and noticing the general condition of the patient; the pulse rate was never lower than 84 nor higher than 95; the respiration was between 20 and 24, and there was no unusual cyanosis of the patient; at the conclusion of the operation the patient was breathing normally, when the anæsthetist noticed a sudden failure of respiration; he immediately felt for the pulse in front of the ear and found none; he also felt for the pulse in the neck and found none; he then forced oxygen to the lungs of the patient and notified the surgeon, the surgeon listened to the patient's heart with his ear but was unable to distinguish any heart sound; the surgeon thereupon turned the patient's head to the right and grasped the tongue with forceps and pulled the tongue out, while the anæsthetist wiped out the mucous which was bubbling from the mouth; the mucous continued from the mouth for several minutes; the mask was replaced and oxygen again forced into the patient's lungs by the machine; a hypodermic of adrenalin of fifteen drops was injected directly into the heart muscle; the rectum was dilated; that during all the time which I have mentioned, from the discovery on the part of the anæsthetist that the respiration had stopped, he was using forced oxygen through the machine. Do you have an opinion as to whether or not the treatment of the patient by the doctors mentioned would constitute skillful practice and proper practice in Hutchinson, Kan., or similar communities?"

The doctors answered that they had an opinion.

"And what is that opinion? A. My opinion is that that would be good treatment for such an injury in any community. That is an established recognized treatment for emergency injuries such as this was."

We have given careful consideration to the contentions of the plaintiff, have considered the evidence, the hypothetical question propounded to the doctors, and are unable to say that the trial court committed reversible error. The evidence shows that the

patient undoubtedly died from an embolism rather than from having been smothered to death or asphyxiated by the gas administered as the anæsthetic. If the testimony of the various doctors is to be given credence at all (and under the circumstances it was proper), there is an abundance of evidence to sustain the verdict of the jury. It was not only not shown that the gas caused the patient's death, but the reasonable indications from the evidence were that the death was caused by an embolism.

"What is the proper treatment to be used in a particular case is a medical question to be testified to by physicians, as expert witnesses; laymen, even jurors and courts, are not permitted to say what is the proper treatment for a disease or how a specific surgical operation should be handled." (*James v. Grigsby,* 114 Kan. 627, 632, 220 Pac. 267.)

"This evidence must, from the very nature of the case, come from experts, as other witnesses are not competent to give it, nor are juries supposed to be conversant with what is peculiar to the science and practice of the professions of medicine and surgery to that degree which will enable them to dispense with all explanations." (*Tefft v. Wilcox,* 6 Kan. 46, 59.)

This court, in *Pettigrew v. Lewis,* 46 Kan. 78, 26 Pac. 458, quoted from McClelland, Civil Malpractice, p. 304, as follows:

" 'The question whether a surgical operation has been unskillfully performed or not is one of science, and is to be determined by the testimony of skillful surgeons as to their opinion, founded either wholly on an examination of the part operated upon, or partly on such examination and partly on information derived from the patient; or partly on such examination, partly on such information, and partly on facts conceded or proved at the trial.' " (p. 81. See, also, *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881.)

There was testimony that immediately or soon after the patient's death Doctor Hall stated to the plaintiff or some other member of the family that it was "just a case of gas." This testimony, however, was disputed by Doctor Hall, who performed the operation, and by Doctor Fowler, who administered the anæsthetic. The testimony of the physicians was that in emergency cases, before giving an anæsthetic, it is necessary only to examine the heart and lungs, which can be done by listening to the heart with the ear, and feeling the pulse, which was done in this case. Also the giving of a hypodermic consisting of one-fourth of a grain of morphine and 1-150 of a grain of atropine thirty minutes before the anæsthetic is sufficient. They also testified that a blood pressure and breathing test is not necessary, and that a urine analysis and blood-pressure test is not necessary in case of an emergency.

Updegraff v. Gage-Hall Clinic.

There was no evidence of any unusual condition of the patient nor that a preëxamination would have disclosed any contra indication of nitrous oxygen and oxygen anæsthesia at or before the time of the giving of the anæsthetic, or that any test other than was given would have disclosed anything to have made the giving of the anæsthetic improper. The plaintiff failed to show any negligence either in the failure to make a preëxamination of the patient or in the administration of the anæsthetic. On the other hand, there was the expert evidence of a number of doctors to the effect that the operation and the handling of the patient was done in a skillful manner.

For instance, Dr. Frank J. Hall (not related to the defendant), a graduate (1900) of the medical college of the University of Kansas, a specialist, a pathologist, who limits his work to the investigation of the causes, progress and result of diseases to the exclusion of a practice, who had done postgraduate work in his line at the University of Chicago, now practicing in Kansas City, Mo., associated with General Hospital and Mercy Hospital, testified that for 27 years it had been part of his work to conduct *post mortem* examinations on the cause of death, and particularly as to the cause of death of those dying on the operating table; that he heard the question read to Doctor Francisco and particularly that portion of it as to the pathological indication of the death of the patient. Had an opinion that the death was caused by the blocking of the artery that supplied the lung with blood. Technically the name is pulmonary embolism.

"Embolism is the name of the condition or process. The thing that caused it is known as an embolus. Some of the things that cause death from this source might be embolism caused by a clot of blood or by air or by fat or even by tissue fragments. . . . Pulmonary embolism causes death by cutting off the blood supply and the blood tissue to the lung. In that case death is more or less instantaneous. The particular portion of the statement of facts which was stated in the hypothetical question, and which I rely upon as showing that this death was caused by embolism, was the sudden cessation of the respiration and the cardiac action; the simultaneous arrest of both functions and the frothy material that emerged from the mouth of the patient. That frothy material that emerged from the mouth is a symptom of embolism. When the arterial blood is shut off from the lung and the venous blood remains in the vessels of the lung, there is immediately great quantities of mucous collected in the bronchial tubes, on account of no pressure on one side and the normal pressure on the other, and that is what causes this saliva, this substance, to come out of the mouth."

Dr. Ralph M. Waters, a specialist in anæsthesia, among other things testified:

"I heard the testimony of Doctor Hall with regard to the mucous found in the mouth at the time of the death and immediately preceding. That is not a characteristic of nitrous oxid asphyxiation, or of death from any cause from nitrous oxid. It struck me when I heard that testimony that the nitrous oxid anæsthesia, as the cause of his death, was impossible for that reason, because with the dose of atropine previous to the dose of nitrous oxid anæsthesia, the mouth would be decidedly dry, as I think any of you will recognize the fact that with a dose of atropine your mouth would be so dry you would spit cotton. In my work as an anæsthetist and in my preparation to become such, I had occasion to familiarize myself with the conditions surrounding the patient during the course of an anæsthetic, and I have had a good deal of education in it since. I have had occasion since I took up this specialty to see cases where there was mucous in the mouth such as was described in this case; there is a great deal of mucous in the mouth in some sorts of anesthesia, but not with nitrous oxid."

A contention that the hypothetical question invaded the province of the jury cannot be sustained. The question asked was properly hypothetical. It propounded the query whether or not certain specified treatment of the patient by the doctors would constitute skillful and proper practice in Hutchinson or similar communities. The answer was in the affirmative. It was for the jury to conclude whether or not the treatment administered to the patient in the instant case was skillful and proper. It was within the province of plaintiff's counsel to have propounded a hypothetical question covering the facts in issue, according to his theory, if the question propounded by his opponent did not do so.

Complaint is made of the instructions. It is unnecessary to set them out or discuss them in detail. We have considered them and are of the opinion that they fairly covered the issues in the case. Various other complaints have all been considered, but we find no error which would warrant a reversal.

The judgment is affirmed.