No. 42,453

CECILE CAPPS, *Appellant*, v. WILLIAM L. VALK, *Appellee*.

(369 P. 2d 238)

Opinion filed March 3, 1962.

*Harold E. Gregg*, of Topeka, argued the cause, and *Walter Fuller, Jr.*, of Kansas City, was with him on the briefs for appellant.

*John J. Adler,* of Kansas City, argued the cause, and *H. S. Roberts,* of Kansas City, was with him on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: This was an action to recover damages for malpractice in leaving an eight-inch drain tube in the body of the plaintiff. The case was here previously, *Capps v. Valk,* 184 Kan. 796, 339 P. 2d 62, and it was held plaintiff's second amended petition alleged a cause of action against the defendant. Trial was had upon the issues by a jury, and at the close of the plaintiff's case the district court sustained defendant's demurrer to the plaintiff's evidence and entered judgment for the defendant. Thereafter the plaintiff filed a motion for a new trial, which was overruled, and this appeal followed.

The evidence is summarized and quoted: Plaintiff, Cecile Capps, is married and resides with her husband in Independence, Kansas. She had pain in the region of her left kidney and had been running a temperature over a period of several days. She consulted Dr. R. G. Carter, of Independence, their family physician. Dr. Carter advised her to have an X-ray of that area as he thought it was probable a stone was located some place in the kidney or ureter. X-rays were taken, later sent to the defendant, which disclosed a stone in the left ureter. Dr. Carter advised the plaintiff her condition necessitated special treatment and he recommended the defendant, Dr. William L. Valk, who was a specialist in urology and also head of the section of urology at the University of Kansas Medical Center in Kansas City, Kansas. Dr. Carter was well acquainted with Dr. Valk and knew of his specialized professional ability, and had previously referred patients to him. Dr. Carter called Dr. Valk at the Medical Center concerning the plaintiff's condition and told him he was referring her to him for treatment. Dr. Carter advised the plaintiff to go to the Medical Center where she would be treated personally by the defendant.

Plaintiff entered the University of Kansas Medical Center on November 29, 1955, as a "private patient" under the care of the defendant who was her private physician and surgeon. A "private patient" is one who goes to the Medical Center to receive the specialized care and treatment of a particular physician and surgeon as his private patient and who pays him for his professional services which he personally retains. In addition, the private patient pays to the state of Kansas the usual costs of hospitalization.

The defendant examined the plaintiff and the X-rays forwarded to him by Dr. Carter, and he knew she had a stone in the lower end of the left ureter, the tube which connects the kidney to the bladder. At that time he also knew her kidney was badly diseased and that the stone was completely blocking the passage.

On December 6, 1955, the defendant operated on the plaintiff and removed the heavily impacted stone. After the stone was removed, the defendant placed a rubber tube approximately an inch in diameter and ten inches long in the opening to drain the area. About two inches of the tube extended beyond the skin surface. It is a standard practice to put such a tube in such an opening. The defendant gave instructions to the resident physician, Dr. Woodard, to remove the tube on the tenth postoperative day. On that day Dr. Woodard removed the stitches and clipped the tube off even with the skin surface, but the tube was never removed at the hospital.

During the time the plaintiff was in the hospital she was visited and attended by numerous interns, residents and other doctors, and the defendant visited her daily and checked her chart to see whether her temperature, pulse and respiration were normal which indicated to him the course of her recovery.

The plaintiff was discharged on December 21, 1955, and in response to a question whether he checked to see if the tube was removed the defendant stated, "I looked at her incision before she went home and it looked satisfactory to me, so I discharged her."

After the plaintiff returned to her home the incision continued to drain from about a half-inch opening and she was required to change the dressings day and night. Plaintiff was in pain most of the time and was unable to do her housework; she was unable to sleep, and her side felt like a "bee stinging in there," and she knew "something was wrong." Six weeks to the day after the operation, plaintiff and her husband went to Dr. Carter's office where he examined the incision, found the tube, and removed it. After the tube was removed the incision continued to drain for about ten days during which time plaintiff was still unable to do her housework, she was in bed most of the time, her side was sore, and she experienced fever and chills.

The defendant testified as a witness for the plaintiff, and on both direct and cross-examination he gave candid and forthright answers. The evidence was undisputed that when plaintiff entered the Med-

ical Center she entered as the private patient of the defendant to receive his specialized care and who later billed her for his services which she paid directly to him. It is the settled rule that one who engages a physician or surgeon (the terms "physician" and "surgeon" are here used interchangeably) to treat his case impliedly engages him to attend throughout the illness or until his services are dispensed with. In other words, once initiated, the relationship of physician and patient continues until it is ended by the consent of the parties, revoked by the dismissal of the physician, or until his services are no longer needed. A physician has a right to withdraw from a case, but if he discontinues his services before the need for them is at an end, he is bound first to give due notice to the patient and afford the latter ample opportunity to secure other medical attendance of his own choice. If a physician abandons a case without giving his patient such notice and opportunity to procure the services of another physician, his conduct may subject him to the consequences and liability resulting from abandonment of the case. (41 Am. Jur., § 72, p. 194; 70 C. J. S., Physicians and Surgeons, § 39, p. 945.) Furthermore, the defendant testified that the standards and duties of a physician existing at the Medical Center was that where a private patient, such as the plaintiff, engages the services of a specialist and enters the hospital for surgery, the duty of the specialist does not end with the performance of the surgery but extends to aftercare of the patient including the duty of visiting the patient, making sure the patient is convalescing satisfactorily, and finally discharging the patient; that if complications arise during the time the patient is in the hospital, the surgeon would immediately know about it and take appropriate steps.

The district court evidenced great concern about the problem of making interns, residents, and other doctors at the Medical Center, who were paid salaries by the state of Kansas, agents of the defendant who was a professor and instructor at the Center and who was also paid a salary by the state. That is not the problem. Where the employer is a state governmental agency and immune from tort responsibility under the governmental function doctrine, the official cloak of immunity does not extend to the negligent employee, as an individual, so as to shield him from answering for his wrongful act by which another has suffered injury. (*Emrie v. Tice*, 174 Kan. 739, 744, 258 P. 2d 332; *Rose v. Board of Education*, 184 Kan. 486, 337 P. 2d 652; *Voss v. Bridwell*, 188 Kan. 643, 657, 364 P. 2d 955.) The defendant was not acting as a professor and instructor when he per-

formed surgery on the plaintiff. His employment was not special and limited to surgery only, but he was acting as a physician in private practice to attend the plaintiff who was his private patient. Under his own testimony, he owed a duty to the plaintiff to provide aftercare, to visit her regularly and make sure she was convalescing satisfactorily and to discharge her from the hospital. While the defendant testified he had no duty to check and make sure the tube was removed prior to her discharge, we think that the exercise of a reasonable degree of learning, skill and experience required otherwise. (41 Am. Jur., Physicians and Surgeons, § 82, p. 201; *Voss v. Bridwell*, supra.)

The plaintiff's evidence established negligence on the part of the defendant in leaving the drain tube in her body. That is prima facie negligence. In *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 317 P. 2d 472, it was held that the leaving of surgical tape (also termed a gauze or sponge) in the plaintiff's body established a prima facie case of negligence.

We think the district court erred when it sustained defendant's demurrer to the plaintiff's evidence and in entering judgment for the defendant. That order is set aside and the case is reversed with directions to grant the plaintiff a new trial.