No. 44,658

Billy E. Collins, *Appellant*, v. Bruce P. Meeker, D. Cramer
Reed and George J. Mastio, *Appellees.*

(424 P. 2d 488)

Opinion filed March 4, 1967.

*Russell Cranmer*, of Wichita, argued the cause, and *Gerald L. Michaud, Orval L. Fisher, M. William Syrios*, and *Kenneth L. Ingham*, all of Wichita, were with him on the brief for the appellant.

*William Tinker*, of Wichita, argued the cause, and *Arthur W. Skaer, Hugh P. Quinn, Alvin D. Herrington, Richard T. Foster, Lee H. Woodard, William A. Hensley* and *William Tinker, Jr.*, all of Wichita, were with him on the brief for the appellees.

The opinion of the court was delivered by

FONTRON, J.: In this action, Billy E. Collins, the appellant herein, has sued three Wichita doctors for alleged malpractice. Three pretrial conferences were had as a result of which the trial court entered summary judgment against Collins and in favor of all three defendant doctors. Collins has appealed from that judgment. In this opinion we will refer to him as plaintiff, or Collins.

Before attempting a recital of the facts, we should point out that each of the defendants is charged with separate acts of negligence. There is no claim that the doctors acted in concert, nor is any question of agency involved in this case.

Highly summarized, the facts which we have gleaned from the pleadings, the admissions of the parties, the various depositions taken in preparation for trial and certain hospital records, appear to be as follows: About January 4, 1962, the plaintiff injured his left groin while at work. Shortly thereafter, his employer sent him to the company doctor, the defendant, Bruce P. Meeker, who upon

examination, found a hernia in the left inguinal area. Some three weeks later, Dr. Meeker performed surgery to repair the hernia.

The plaintiff continued to have discomfort and pain in the left groin and down into the scrotum and in May, 1962, he consulted a Dr. Binyon, who is not a party to this lawsuit. Dr. Binyon referred Mr. Collins to the defendant, George J. Mastio. After examining Collins, Dr. Mastio felt he should undergo a period of watching and waiting.

In late November, 1962, apparently at Dr. Binyon's suggestion, Collins consulted D. Cramer Reed, who is also a defendant in this action, and related to him his complaints of pain, nausea and difficulty in having marital relations. Dr. Reed performed a cystoscopic examination of the plaintiff, following which he advised Collins to have more frequent sexual intercourse.

In March, 1963, the plaintiff returned to Dr. Mastio, again at Dr. Binyon's advice, and reiterated his complaints of pain at the site of the hernia repair and radiating down into the scrotum. On April 3, 1963, Mastio operated at the old incision site. Collins continued to have pain and Dr. Mastio rehospitalized him on August 2, 1963. Shortly thereafter (the exact date not being shown) Dr. Mastio discharged the plaintiff as his patient, telling him (according to the plaintiff) that he should go home and get help the best way he could; that he, Mastio, was sick of the whole deal and that Collins was sick in the head and no medical doctor could do him any good.

On August 6, 1963, still suffering pain, Collins consulted Dr. Curtis C. Drevets, who referred him to Dr. Jack W. Graves. Neither of these doctors is a party to this lawsuit. On August 28, Dr. Graves performed a third operation on the plaintiff in which he removed the left testicle.

Against this factual background, we proceed to tabulate the specific acts of negligence which have been charged against each of the three defendants, individually.

1. Dr. Meeker: (a) Failing to advise and inform the plaintiff of the risks inherent in the hernia operation he was about to perform.

(b) Rebuilding the left external inguinal ring so tightly that it interfered with the supply of blood to and from the left testicle and the flow of secretions therefrom.

2. Dr. Reed: (a) Prescribing more frequent intercourse when the external ring was so tight that it interfered with the flow of blood and secretions.

3. Dr. Mastio: (*a*) Failing to inform the plaintiff of risks inhering in the hernia operation he was about to perform.

(*b*) Rebuilding the left inguinal ring so tight so that it interfered with flow of blood to and from the left testicle and the flow of secretions therefrom.

(*c*) Incising the spermatic cord during his exploratory surgery.

(*d*) Failure to acquaint himself with previous hospital records pertaining to plaintiff.

(*e*) Discharging and abandoning plaintiff on August 3, 1964, and informing him there was nothing wrong except "he was sick in the head."

At this point we take note of the plaintiff's insistence that the trial court erred in rendering summary judgment at a pretrial conference without previous notice and without a motion for summary judgment having been filed. This identical issue was raised in the recent case of *Green v. Kaesler-Allen Lumber Co.*, 197 Kan. 788, 420 P. 2d 1019, where it was determined adversely to the plaintiff's contention. No good purpose would be served by repeating all that was said in the *Green* opinion. We believe it sufficient here, to reiterate that a trial court has inherent power to dispose summarily of litigation where no genuine issue exists as to any material fact and where, giving effect to every reasonable inference which can be drawn from the evidence, judgment must be for one party or the other, as a matter of law. Such authority may be exercised by a trial court even though no motion has been filed or prior notice given, provided neither party is placed at a disadvantage because thereof.

Although the trial court couched its order in terms of a dismissal, it seems clear that all parties to this action, as well as the court itself, considered the order to be in the nature of a summary judgment in favor of the defendants. Accordingly, the principles governing the rendition of summary judgments are applicable. (See K. S. A. 60-212 [*b*] [7].)

In passing, we may observe that while no formal motion had been filed prior to the conference of November 1, 1965, at which the court announced that summary judgment would be entered, we believe it would prove difficult for plaintiff to establish that he had been prejudiced thereby. At a pretrial conference held September 7, the subject of summary judgment came up, so plaintiff may hardly claim surprise. However, of greater significance is the fact that the court,

at the conclusion of the November conference, gave plaintiff twenty additional days to show cause why the action should not be dismissed. Nothing new is shown to have been presented by the plaintiff and we must assume he chose to stand on the record already made.

The substantial issue presented on appeal is whether the trial court was correct, as a matter of law, in rendering summary judgment in favor of the defendants. Before we can arrive at a decision on this point, we will be required to examine the charges made against each defendant separately. Before doing so, however, we believe it advisable to restate the general rule, long adhered to by this court in malpractice cases of this character, that expert medical testimony is ordinarily required to establish negligence or lack of skill on the part of a physician or surgeon, in his medical diagnoses, his performance of surgical procedures and his care and treatment of patients. (*Tefft v. Wilcox,* 6 Kan. 46, 59; *Sly v. Powell,* 87 Kan. 142, 123 Pac. 881; *Rainey v. Smith,* 109 Kan. 692, 694, 201 Pac. 1106; *Updegraff v. Gage-Hall Clinic,* 125 Kan. 518, 264 Pac. 1078.) The significance of this rule will become manifest as we progress in our discussion.

We would also point out at this juncture that an exception to the general rule exists where the results of medical treatment are so patently bad as to be manifest to lay persons or as to come within the common knowledge and experience of mankind generally. (*Yard v. Gibbons,* 95 Kan. 802, 149 Pac. 442; *Stockholm v. Hall,* 145 Kan. 291, 294, 65 P. 2d 348; *Riggs v. Gouldner,* 150 Kan. 727, 728, 96 P. 2d 694.)

Mindful of the foregoing rule and its exception, we first direct our attention to the case charged against the defendant Reed. As to him, only one act of negligence is alleged, namely, that he advised increased sexual activity on the part of plaintiff. The record does not disclose with what alacrity Mr. Collins responded to this suggestion, or with what zeal he pursued it, but whatever may have been his response, the results obtained appear to have been negative.

It is well established that an inconclusive or unsatisfactory result obtained by a patient from following the advice given him by a medical practitioner, after a diagnosis has been made, is not necessarily evidence of negligence on the part of the doctor. In *Riggs v. Gouldner,* supra, we said:

"A physician or surgeon is not a guarantor of the correctness of his diagnosis or of the efficacy of the treatments prescribed (48 C. J. 1119, 1120), but he is required to exercise the degree of skill and learning ordinarily possessed and exercised under similar circumstances by the members of his profession in good standing and to use ordinary and reasonable care and diligence and his best judgment in the application of his skill to the case. (48 C. J. 1113.) Negligence cannot be presumed from the mere failure to obtain the best results. (*Paulich v. Nipple,* 104 Kan. 801, 180 Pac. 771.) . . ." (p. 728.)

Dr. Reed, himself, performed no surgery and no claim has been advanced that he was in anywise negligent in conducting the cystoscopic examination of the plaintiff. Reed can be held liable, if at all, on the single theory that he was negligent in prescribing more frequent intercourse for Collins under the circumstances known to him.

The record contains no medical or scientific evidence to substantiate the theory that in prescribing increased sexual activity, Dr. Reed deviated from acceptable medical practice. Indeed, the plaintiff makes no pretense of producing expert medical evidence to sustain the charge leveled against Reed. At the second pretrial conference held in September, plaintiff's counsel flatly declared he did not intend to offer expert medical evidence to prove that Reed was negligent or that his advice constituted a departure from sound medical standards. So far as making a case against Reed is concerned, the plaintiff has relied on two factors; one that the inguinal ring was too constricted, the other, that Dr. Reed advised more frequent intercourse.

Although we lay no claim to expertise in the realm of matters sexual, or to knowledge of concerns testicular, we nonetheless hold the opinion that liability on the part of Reed cannot be established without the aid of expert medical testimony. In other words, we do not understand the treatment prescribed by Reed to be so mischievous or fraught with hazard as to come within the common knowledge or experience of mankind. For aught the record shows, and for aught we know, the type of treatment recommended by Dr. Reed may be quite the popular theory in contemporary medical circles.

Nor do we find anything in the record from which knowledge of a constricted inguinal ring may be imputed to Dr. Reed, even though the plaintiff had complained of swelling and pain. The examination conducted by Reed before making his diagnosis revealed no such stricture, and it is conceded he was not negligent

in conducting that examination. We consider the trial court was correct in entering summary judgment in favor of Dr. Reed, and we hold that its judgment in such regard must be sustained.

The only two grounds of negligence urged against Dr. Meeker, who performed the first surgery on Mr. Collins, are likewise leveled against Dr. Mastio, who performed the exploratory operation a year or so later. In the interest of brevity, these two charges of negligence, since they are identical, will be considered against the two doctors together.

The first charge is that both doctors failed to inform the plaintiff of the risks inherent in the hernia operation which each one performed. In advancing this contention, the plaintiff takes the position that he is not required to offer medical testimony to establish what disclosures should have been made to him by the respective doctors. Instead, Collins relies on this court's holding in *Natanson v. Kline*, 186 Kan. 393, 350 P. 2d 1093, reh. den. 187 Kan. 186, 354 P. 2d 670.

In that case, the plaintiff brought suit to recover damages which she allegedly sustained as a result of radiation therapy through the medium of radioactive cobalt. One of the grounds of negligence charged against the defendant, Dr. Kline, was that he had failed to warn Mrs. Natanson that the course of treatment he proposed to administer involved grave consequences, including the risk of bodily injury or even death.

Because this question had not previously been presented to this court, it was considered and discussed in some depth in two scholarly opinions written by Justice Schroeder. The first opinion, which followed the original presentation of the case, was later amplified by a second opinion denying a rehearing. Together, they contain a comprehensive treatment of the subject. We shall not burden this opinion by repeating everything that was said in *Natanson*. Instead, we refer the perceptive reader, who is interested in the ramifications of this legal problem, to a serious study of the decisions filed in that case and the numerous citations and authorities set forth therein.

What we believe does need to be stated at this point is that in *Natanson* this court held, in practical effect, that in the absence of an emergency, a physician has an obligation to make a reasonable explanation and disclosure to his patient of the risks and dangers which inhere in a proposed course of treatment (and, we may add,

in a proposed operation) to the end that whatever consent the patient gives to the prescribed treatment (or operation) may be an informed and intelligent consent; that where a physician, or surgeon, is silent and makes no disclosure whatever, he has failed in the duty owed to his patient and the patient is not required to produce expert medical testimony to show that the doctor's failure was contrary to accepted medical practice, but it devolves on the doctor to establish that his failure to make any disclosure, did, in fact, conform, under the confronting conditions, to accepted professional standards; and that where actual disclosures have been made and are ascertainable, then expert medical testimony is required to establish that the disclosures made did not accord to those which reasonable medical practitioners would divulge under the same or like circumstances.

In the later case of *Williams v. Menehan,* 191 Kan. 6, 379 P. 2d 292, the subject of informed consent again came before this court and we adhered, in essence, to the rules expressed in *Natanson.* In the *Menehan* opinion this court pointed out that the facts before it were unlike those appearing in the *Natanson* case, where the doctor had made no disclosures whatever. In *Menehan* we specifically said:

".  .  . There is nothing in this action to detract from the rules of law laid down in the *Natanson* case." (p. 11.)

At no time has this court ventured to say that a physician or surgeon is under obligation to disclose any and all results which might possibly follow a medical or surgical procedure. Nor would we now deny that there may well be circumstances under which it would be bad therapeutic practice to disclose the nature, the procedures and the possible harsh results of treatment. Even though a patient may be relieved of the burden of showing, by expert evidence, that his doctor's silence deviated from acceptable medical practice, there is nothing in this rule which would preclude the doctor, himself, from showing that his silence did, in fact, comply with medical standards under the facts then facing him. We continue to believe that the principles enunciated in *Natanson* are valid.

Examination of the record reveals that Dr. Meeker disclosed no adverse effects whatever which might follow a hernia operation. In his deposition, he testified:

"Q. And you do not recall telling him [Collins] any adverse effects that he might have as a result of the hernia operation?

"A. No.

"Q. Did you at any time tell him that he may have trouble following the operation with his left testicle?

"A. No.

"Q. Did you tell him what the dangers were in connection with this operation?

"A. I did not.

We believe this testimony brings the case against Dr. Meeker, so far as the charge of failing to advise Mr. Collins is concerned, within the *Natanson* rule, and that it would not be incumbent on Collins to present expert evidence on this point. This conclusion will require reversal of the summary judgment entered against the defendant, Meeker.

However, we believe that a different situation exists as to the defendant, Mastio, in this regard. In his deposition, Dr. Mastio stated, in effect, that as he generally did with his patients, he told plaintiff the type of operation he would undergo, what he, Mastio, expected to do and the results plaintiff could expect and that he asked plaintiff if he had any questions about it. This evidence is not denied and, although Mastio does not detail the specific disclosures made and did not recall giving certain information, we think the situation is one where the precise disclosures were ascertainable and where the plaintiff would be required to show by expert testimony that the explanation given failed to comply with reasonable medical practices.

The second charge of negligence brought against both Meeker and Mastio is this: that each was negligent in rebuilding the external inguinal ring so tight that it interfered with the supply of blood to and from the left testicle and the flow of secretions therefrom. Plaintiff's counsel announced at the pretrial conference that he neither had, nor expected to secure, any medical testimony to support this charge of negligence against either doctor. Plaintiff has taken the position, throughout, that expert evidence is not required under the circumstances of this case.

We do not concur in the view taken by plaintiff on this point. It is true that Dr. Graves, who performed the third and last operation, deposed "that the spermatic cord was edematous (swollen) from the external ring due to a tight closure." He also stated in his deposition that scar tissue will cause the ring to be tight, that

some scar tissue is to be expected, and that some room is left for scar tissue to form.

Despite this testimony on the part of Dr. Graves, which we are not inclined to view as wholly unequivocal, we believe that expert evidence would be required to prove that either doctor was negligent in the matter of closing the inguinal ring. In other words, we believe negligence concerning that matter cannot be predicated, as a matter of general knowledge, on the fact which were before the court at the pretrial conference. As we have said before, the failure of a surgeon to achieve the best possible results from an operation does not, of itself, raise any presumption of negligence on his part (*Hill v. Hays*, 193 Kan. 453, 458, 395 P. 2d 298.)

So far as tightness of the inguinal ring is concerned, we simply are unable to say that such negligence and lack of professional skill has been shown as to negative the need for expert testimony. As examples of a situation in which it might be said the results of medical treatment were so unfavorable as to warrant an inference of negligence from lay testimony alone, when considered in the light of common knowledge and experience, we call attention to *McMillen v. Foncannon*, 127 Kan. 573, 274 Pac. 237, where a physician failed to set a broken arm and discharged his patient before the bone had set and while the ends overlapped, *Bernsden v. Johnson*, 174 Kan. 230, 255 P. 2d 1033, where a metal "airway" or tube was left in the throat of a patient, and *Russell v. Newman*, 116 Kan. 268, 226 Pac. 752 and *Rule v. Cheeseman, Executrix*, 181 Kan. 957, 317 P. 2d 472, where surgical sponges had not been removed following surgery.

No carelessness of the magnitude appearing in the above examples is shown here. From the information contained in the depositions of medical practitioners filed in this case, we are forced to conclude that a hernia operation, while it may be fairly common, is nonetheless an intricate and delicate procedure requiring considerable dexterity and an intimate knowledge of the groin area itself and the organs which are therein located. The operation, in our opinion, is far too complex and technical, and the possible results too numerous and unpredictable, to permit lay witnesses to express opinions as to the proficiency with which the operation has been performed or to permit a jury to speculate as to the adequacy and skillfullness of its performance solely in the light of their common knowledge and experience.

The plaintiff suggests that the doctrine of *res ipsa loquitur* is applicable under the facts of this case. We disagree. It is generally held that the doctrine is not available in actions brought to recover damages for malpractice. In 70 C. J. S., Physicians and Surgeons, § 62a, p. 992, we find the following statement of the rule:

". . . The doctrine of *res ipsa loquitur* is not applicable where the common knowledge or experience of men is not extensive enough to permit it to be said that plaintiff's condition would not have existed for negligence of the person charged . . ."

The application of *res ipsa loquitur* to an action of malpractice was the subject of serious discussion in *Voss v. Bridwell*, 188 Kan. 643, 364 P. 2d 955, where this court said:

"Established general rules in this jurisdiction which particularly militate against application of the doctrine of *res ipsa loquitur* in malpractice cases are: (1) That a physician or surgeon *is presumed to have carefully and skillfully treated or operated* on his patient, and *there is no presumption of negligence to be indulged from the fact of injury or adverse result* by reason of such treatment or operation; and (2) To establish liability in a medical malpractice case there must be proof by *expert medical testimony* that there was a lack of due care or that approved procedure and methods were not followed." (p. 659.)

It is only in those cases where common knowledge, observation and experience has shown that injury would not have resulted to a patient if reasonable medical or surgical care had been used, that negligence can be inferred from the injury, itself, and the doctrine of *res ipsa loquitur* can be applied.

While this court has twice applied the rule of *res ipsa loquitur* in malpractice actions, the circumstances of neither case were comparable to those revealed here. In *Voss*, an endotracheal tube was inserted into the esophagus of a patient undergoing surgery and was left there during the entire operation, as a result of which the patient was deprived of air and was rendered decerebrate. In *Emrie v. Tice*, 174 Kan, 739, 258 P. 2d 332, a patient suffered severe x-ray burns to his face, head and neck, during radium therapy for removal of a wart from his right ear. We believe neither of these cases is authority for applying the doctrine here and we decline to do so.

There is, however, expert testimony that Dr. Mastio did not follow approved medical procedures when he cut into the spermatic cord during his operation on the plaintiff. Dr. Mastio said in his deposition that it was necessary to dissect the ilioinguinal nerve

from the spermatic cord so the cord could be opened for repair of the hernia inside.

Evidence that incision of the spermatic cord during a hernia repair constitutes a departure from usual standards of medical practice is found in the deposition given by Dr. Meeker, which reads in part:

"Q. In making a hernia repair do you incise the spermatic cord?

"A. No, sir.

"Q. *If a doctor incises the spermatic cord in making a hernia repair, is he following the procedure done in this community?*

"A. *He isn't following the procedure concerned in any community.*

"Q. All right.

"A. If you mean cut the spermatic cord.

"Q. Doctor, there are a lot of terms I may not be familiar with and I understand 'incise' means 'cut' and I used 'cut' awhile ago and you didn't like the word, so 'incise' means 'cut' as I understand it.

"A. Yes, you certainly don't incise the spermatic cord. You identify it.

"Q. But you do not cut it open?

"A. No.

"Q. Or stitch it back?

"A. No.

"Q. All right.

"A. Don't have any excuse to. The only time you would do that would be in sterilization."

The deposition of Dr. Meeker supplies sufficient substantial evidence of failure on the part of Dr. Mastio to employ the skills, or follow the recognized practices of his profession, to preclude summary judgment in his favor. Summary judgment may not be entered where a genuine issue of fact remains unresolved (*Brick v. City of Wichita,* 195 Kan. 206, 403 P. 2d 964; *Timmermeyer v. Brack,* 196 Kan. 481, 412 P. 2d 984), even though the court may harbor the suspicion that one or the other party will be unable to prevail upon a trial (*Green v. Kaesler-Allen Lumber Co.,* supra).

The plaintiff asserts two additional grounds in support of his contention that the trial court erred in entering summary judgment in favor of Dr. Mastio. We will refer to them briefly:

We understand plaintiff to contend that a surgeon's failure, prior to performing surgery, to consult previous hospital records relating to his patient is *per se* a departure from established medical standards and, hence, constitutes negligence. No authority has been cited to support this proposition and our limited research has disclosed none.

As laymen, ourselves, wholly unschooled in the science of medicine, we are not disposed to say that examination of prior hospital records is a required or even a sound medical practice. We conclude that what may be the acceptable medical standard for examining past hospital records does not come within the realm of common knowledge and experience, but must be shown by experts in the field.

In connection with the plaintiff's claim that Dr. Mastio abandoned him, we need only point out that a similar contention was before this court in *Capps v. Valk,* 189 Kan. 287, 369 P. 2d 238, where we said:

"It is the settled rule that one who engages a physician or surgeon (the terms 'physician' and 'surgeon' are here used interchangeably) to treat his case impliedly engages him to attend throughout the illness or until his services are dispensed with. In other words, once initiated, the relationship of physician and patient continues until it is ended by the consent of the parties, revoked by the dismissal of the physician, or until his services are no longer needed. A physician has a right to withdraw from a case, but if he discontinues his services before the need for them is at an end, he is bound first to give due notice to the patient and afford the latter ample opportunity to secure other medical attendance of his own choice. If a physician abandons a case without giving his patient such notice and opportunity to procure the services of another physician, his conduct may subject him to the consequences and liability resulting from abandonment of the case . . ." (p. 290.)

Although the time which elapsed between the date on which the abandonment is said to have occurred and the date Collins consulted another doctor may have been quite short, we believe it only logical to assume that the legal principles espoused in *Capps* would nonetheless be applicable.

That part of the judgment of the court below entering summary judgment in favor of the defendant D. Cramer Reed is affirmed. The summary judgments entered in favor of the defendants Bruce P. Meeker and George J. Mastio are set aside and this action, as to them, is remanded with directions that the court proceed in accordance with the views expressed in this opinion.