(668 P.2d 189)
No. 54,407

Dr. Vernon H. Dicke, P.A., *Appellant,* v. Billie J. Graves and
Paul B. Graves, *Appellees.*

Opinion filed August 18, 1983.

*Ronald D. DeMoss* and *Walter C. Williamson,* of Williamson & Stalcup, Chartered, of Wichita, for appellant.

*M. Ralph Baehr,* of Nieto, Baehr & Hollander, of Wichita, for appellees.

Before Rees, P.J., Spencer and Swinehart, JJ.

Rees, J.: Plaintiff appeals from an adverse jury verdict and judgment entered against him on defendant's counterclaim for medical malpractice. Defendant claimed abandonment.

In 1974, Mrs. Graves became a patient of Dr. Dicke, a practicing dentist. Dr. Dicke rendered continuing services to Mrs. Graves until early 1979 when events giving rise to her counterclaim occurred.

Mrs. Graves had a difficult dental history. Her problems were extensive and continuing. Even prior to her engagement of Dr. Dicke's services, she had had a complete restoration of her teeth, that is, restoration or replacement of all her teeth. Unusual factors complicated her problems and care. Among these were jaw thrust, a temporal mandibular joint abnormality, and peculiar physical sensitivity to the electrolytic interaction of some materials ordinarily used in dental repair and construction of dental appliances.

Mrs. Graves visited Dr. Dicke on January 18, 1979. She reported, and the doctor observed, porcelain fractures in her upper anterior fixed bridgework. Specifically, two or more pieces of porcelain had broken off the bridgework. X-rays were taken both

then and again on January 23 to see if the damage to the bridgework was other than that visually observed. Dr. Dicke found nothing additional in his reading of the x-rays.

He next saw Mrs. Graves on February 3. She complained of a "toothache." During this visit, manual manipulation of Mrs. Graves' bridgework revealed movement and from this the doctor concluded there were stress fractures in the metal core of the bridgework. He testified that from and after February 3, it was his opinion that in view of the patient's multiple dental problems, a complete restoration of her teeth was necessary. He also testified he so informed her on February 3.

On March 15 and March 20, upper and lower impressions of Mrs. Graves' mouth were taken at Dr. Dicke's office. The purpose, according to the doctor, was to gain information for his determination of a recommended complete restoration treatment program.

Mrs. Graves continued to be in discomfort and able to ingest a soft foods diet only. Her husband personally delivered a letter to Dr. Dicke on March 27. She and her husband made telephone calls to the doctor's office on two or three later dates. The purpose of these communications was to seek relief from Mrs. Graves' discomfort and commencement of a complete restoration program. Dr. Dicke did not respond. He testified he had no personal knowledge of the telephone calls and he had not decided upon a restoration treatment program plan. Such a program requires numerous treatment procedures and steps over an extended period.

In late April, approximately one month following the delivery of her husband's letter and without notifying Dr. Dicke, Mrs. Graves contacted another dentist, a Dr. Zongker. Dr. Zongker first saw Mrs. Graves on May 1; the movement in the bridgework was observed; a diagnosis of metal fractures in the bridgework was made. Dr. Zongker next saw her sometime in July when he instituted a comprehensive treatment program that was completed in December.

Mrs. Graves relies on other trial evidence to buttress her claim. She and her husband testified that her dental work "broke up" in late December, 1978, or early January, 1979, and that from then until the engagement of Dr. Zongker's services late the following April a total of eleven to fifteen calls to Dr. Dicke's office seeking

appointments for examination and care had resulted in only the five mentioned office visits. Mrs. Graves and her husband patently were disenchanted with perceived failure on the doctor's part to attend to Mrs. Graves' complaints with the promptness and frequency they desired.

The record on appeal reflects no complaint made nor opinion ventured that any diagnoses made by Dr. Dicke were erroneous or that any services rendered were deficient. We find the sole dispositive issue on appeal to be whether the trial evidence was sufficient to establish abandonment.

Tortious medical malpractice includes abandonment. What is it? The applicable principles appear in *Capps v. Valk,* 189 Kan. 287, 290, 369 P.2d 238 (1962), where it is said:

"It is the settled rule that one who engages a physician . . . to treat his case impliedly engages him to attend throughout the illness or until his services are dispensed with. In other words, once initiated, the relationship of physician and patient continues until it is ended by the consent of the parties, revoked by the dismissal of the physician, or until his services are no longer needed. A physician has a right to withdraw from a case, but if he discontinues his services before the need for them is at an end, he is bound first to give due notice to the patient and afford the latter ample opportunity to secure other medical attendance of his own choice. If a physician abandons a case without giving his patient such notice and opportunity to procure the services of another physician, his conduct may subject him to the consequences and liability resulting from abandonment of the case."

See also *Collins v. Meeker,* 198 Kan. 390, 402, 424 P.2d 488 (1967).

It may not be reasonably disputed that Mrs. Graves' engagement of Dr. Zongker's services as of approximately May 1, 1979, effected a unilateral termination of the dentist and patient relationship if that relationship then existed. Did that relationship then exist? The answer is yes only if Dr. Dicke had not by then abandoned Mrs. Graves. He argues he had not. She argues he had. Had he?

The essence of abandonment is unilateral nonconsensual termination by the medical practitioner. When abandonment is claimed, termination by consent is implicitly denied. There had been no termination by consent of the parties.

Had Mrs. Graves revoked, that is, unilaterally terminated, that dentist and patient relationship prior to her engagement of Dr. Zongker? Clearly no. Were Dr. Dicke's services, that is, dental care and treatment, needed after March 27 and through April? Yes. Without dispute, the need for them was not at an end.

Whether Dr. Dicke afforded Mrs. Graves ample opportunity to secure other dental attendance of her own choice after giving her notice of his withdrawal is immaterial. Dr. Dicke gave no notice of withdrawal.

The question here boils down to whether Dr. Dicke withdrew from the dentist and patient relationship. She said he did. For Mrs. Graves to recover for abandonment, it is necessary there be evidentiary proof he did. We conclude withdrawal was not proved.

Defendant Graves summarizes the proof in her brief:

"Mrs. Graves testified that her bridgework broke up not later than January of 1979 and that after this point in time, she attempted to get Dr. Dicke to treat her for this problem on eight to ten different occasions. Mrs. Graves' husband also testified that he attempted to get Dr. Dicke to treat defendant on three to five occasions and finally put it in writing in his letter of March 27, 1979. After March 27, 1979, the evidence is uncontroverted that Dr. Dicke failed to appoint, treat or otherwise contact Mrs. Graves.

"The defendants' expert witness, Dr. Zongker, testified that standard, approved dental practice would require a dentist to see or assist someone in Mrs. Graves' condition in 'a very short period of time.' The evidence before the trial court and jury, taken in the light most favorable to the defendant, Mrs. Graves, showed a situation where Mrs. Graves' bridgework had fractured or broken up sometime prior to January, 1979, and that standard, approved dental practice required treatment, or at least examination, in a very short period of time. Dr. Zongker also testified that a failure to see or assist someone with Mrs. Graves' complaints would be a departure from good medical practice. Although controverted, Mrs. Graves testified that she had been unable to get Dr. Dicke to assist her with the broken up bridgework."

We find this answer insufficient. Not only does it speak of the period from January through April, 1979, a period within which there were office call appointments made and kept, but most importantly, it speaks of nondiligence, that is, delay, inattention and untimely rendition of services. This is, if anything, negligence, not abandonment.

However, defendant expands her answer, saying:

"Even assuming arguendo that Dr. Dicke treated Mrs. Graves during February and March of 1979, the jury could properly have found that Dr. Dicke's failure to appoint or treat Mrs. Graves after March 27, 1979, constituted abandonment in light of Dr. Zongker's testimony that Mrs. Graves should have been seen in a very short period of time."

The crucial flaw in this additional contention is that it still amounts to reliance upon proof of negligence — nondiligence in

rendition of services — and not proof of the doctor's unilateral termination of the dentist and patient relationship.

In only one Kansas case, *Collins v. Meeker,* 198 Kan. 390, do we find there to be involved true abandonment — a medical practitioner's discontinuance of services before the need for them is at an end and without due notice to the patient to afford him or her ample time to secure other professional attendance of his or her own choice. There, assuming the need for medical services continued, a doctor discharged the plaintiff as his patient, allegedly telling the plaintiff that he should go home and get help the best way he could; that he, the doctor, was sick of the whole deal and that the plaintiff was sick in his head and no medical doctor could do him any good. *Collins* also alludes to the lesson that there may be abandonment even though the time which elapses before one received medical care from another doctor is quite short. 198 Kan. at 392, 402.

We conclude defendant's medical malpractice claim judgment is not supported by the evidence and must be reversed. Her claim was that plaintiff abandoned her. Her claim was asserted, tried, and argued on appeal on a basis of nondiligent care, a species of negligence. As we have said, abandonment and negligence do not constitute the same cause of action. Abandonment concerns, in this case, *termination* of the relationship of Dr. Dicke and Mrs. Graves as dentist and patient, a relationship by virtue of which Dr. Dicke had a due care duty to exercise that degree of learning and skill ordinarily possessed and used by members of his profession in his community, or in similar communities, under like circumstances.

Reversed and remanded with instructions to enter judgment in favor of plaintiff on defendant's counterclaim.