Betty J. SPARKS, Appellant,

v.

David HICKS, M.D., and Orthopedic Specialists of Tulsa, Inc., an Oklahoma Corporation, Appellees.

No. 82203.

Supreme Court of Oklahoma.

Feb. 20, 1996.

Gerald D. Swanson, Robert T. Rode, Tulsa, for Appellant.

John H.T. Sheridan, Catherine L. Campbell, Best, Sharp, Holden, Sheridan, Best & Sullivan, Tulsa, for Appellees.

SIMMS, Justice.

Betty J. Sparks, plaintiff below, appeals the summary judgment granted in favor of Defendants/Appellees, David Hicks, M.D., and Orthopedic Specialist of Tulsa, Inc. (OST), on her action for negligence and abandonment by Dr. Hicks. The Court of Appeals reversed the trial court's judgment on the grounds that the evidentiary materials were insufficient to warrant summary judgment.

Certiorari was granted to consider whether summary judgment was proper in this case. Because we find the undisputed facts show that Dr. Hicks did not abandon his patient, Sparks, the opinion of the Court of Appeals is vacated, and the judgment of the district court is affirmed.

Pursuant to complaints of pain in her hip and leg, Sparks was examined by Dr. Hicks who ordered diagnostic tests including magnetic resonance imaging (MRI). The MRI suggested a herniated disk and Dr. Hicks felt that surgery would probably be the next course of action. However, before performing surgery, he wanted to have a myelogram done to confirm the diagnosis and to have a medical consultation done with an internist to see if surgery would be safe for Sparks due to other medical concerns. These other medical concerns included high blood pres-

sure, atherosclerotic coronary artery disease, angina pectoris and chronic obstructive pulmonary disease resulting from years of smoking.

Dr. Hicks' records on Sparks reveal the following notation:

"I discussed with the patient and her son my feelings regarding her medical care. I would like to obtain a myelogram and perhaps a post-myelogram computerized axial tomographic scan, if it seems appropriate. I would like to obtain medical consultation, prior to proceeding with surgical intervention to insure that it is as safe as possible, prior to proceeding with surgery, if in fact it seems surgery is most appropriate. I have asked Dr. James Bailey to see Ms. Sparks in medical consultation and he will see her after the myelogram and proceed with those studies felt to be consistent with good medical care."

On August 5th, Sparks was admitted to the hospital for the myelogram which confirmed the herniated disk diagnosis and the appropriateness of elective surgery. Sparks requested a second opinion, and Harry E. Livingston, M.D., a partner with Dr. Hicks at OST, also concluded surgery would be appropriate. Dr. Hicks scheduled Sparks' surgery for August 7th, and Sparks remained in the hospital until that date. Dr. Bailey, the internist performing the medical consultation to see if surgery was safe, examined Sparks the following day, August 6th. Dr. Bailey's tests confirmed Dr. Hick's concerns about the safety of surgery as he found significant blockage of blood flow in Sparks' heart. This blockage was seen in a total occlusion of the right internal carotid artery and a fifty percent obstruction of the left internal carotid artery. He noted that he would call Dr. Hicks with the results of his examination the next morning, August 7th.

On August 7th, when it came time for surgery, Dr. Hicks had not yet received Dr. Bailey's report. Without Dr. Bailey's opinion that surgery was safe for Sparks, Dr. Hicks canceled the surgery and began arranging for Sparks to be dismissed from the hospital to have surgery the following week. When Sparks' son was informed that Dr. Hicks was not going to perform the surgery that day,

he became angry and confronted one of Dr. Hicks' nurses, threatening to call Sparks' attorney. Feeling that the mutual trust necessary for him and his patient to proceed was destroyed by Sparks' sons actions, Dr. Hicks refused to treat Sparks further.

In an addendum to Sparks' clinical chart, Dr. Hicks notes the situation as follows:

". . . The myelogram was performed which basically confirmed the findings on the MRI and I asked James Bailey, an internist to see her. It was Dr. Bailey's opinion that a more detailed medical evaluation was in order and he did in fact complete this medical evaluation, however he was unable to make his final ascertainment that he felt surgery was safe until this morning, 8–7–92. I had talked with the patient about this. Unfortunately, her son became quite irate at # 1, the fact that we were not able to operate when we had originally planned and that # 2, since it was going to be next week before I could operate that we would consider sending her home over the weekend and he threatened when he was talking to my nurse, Kim Norton over the telephone that if we sent her home over the weekend he was going to call her attorney. In my opinion, this sequence of events has resulted in a basic destruction of the mutual trust necessary for me and the patient to proceed with a operative intervention. I have given her the name of Dr. Ben Benner, Dr. Anthony Billings, Dr. John Coates and Dr. Harry Livingston. I have spoken with Dr. Benner and Dr. Billings already and they have agreed that she could come in to see them in their office next week if she so desires. I will speak to Dr. Coates."

Although this addendum is dated August 7th, it was not signed by Dr. Hicks until August 10. The hospital's "Progress Record" on Sparks shows that on August 7th, Dr. Hicks noted that he would talk with Sparks about other physicians from whom she might receive treatment. Additionally, in the August 7th hospital records, the attending nurse noted the following in the patient data area:

"Pt. requested Dr. John Coate's office phone number. States she was instructed to follow up [with] him in the future."

Finally, Spark's records at OST indicate that Dr. Livingston spoke with her on August 12th about the "confusion surrounding Dr. Hicks' refusal to operate on her and wanting to refer her to another physician." Dr. Livingston helped her schedule an appointment with Dr. Benner.

All of these office records, correspondence and hospital records were submitted by Dr. Hicks and OST with their joint motion for summary judgment. Sparks responded with many of the same medical records and an affidavit from Sparks' attorney explaining what she told him transpired and his conversations with Dr. Livingston at OST. The attorney stated that he received a telephone call from Sparks on August 7th after she was discharged from the hospital. She told him that Dr. Hicks had become upset over a conversation with her son and had told a nurse to discharge her. However, she stated to him that Dr. Hicks never discussed the problem with her.

The affidavit further states the attorney called Dr. Livingston three days later, and Dr. Livingston informed him that Dr. Hicks was upset with Sparks' son and would not perform the surgery. Moreover, Dr. Livingston told the attorney that OST would have nothing further to do with Sparks' case. Upon these purported facts, the district court granted Dr. Hicks and OST summary judgment without making any specific findings of fact or conclusions of law.

A cause of action for abandonment by a physician has never been directly addressed by this Court. However, numerous courts have discussed the elements required to establish abandonment. Those jurisdictions that have considered the question agree that when further medical or surgical attention is needed, a physician may terminate a physician-patient relationship only after giving reasonable notice and affording an ample opportunity for the patient to secure other medical attention from other physicians. *See, for example Lee v. Dewbre,* 362 S.W.2d 900 (Tex.Civ.App.1962); *Johnson v. Vaughn,* 370 S.W.2d 591 (Ky.1963); *Reid v. Johnson,* 851 S.W.2d 120 (Mo.App.1993); *Miller v. Greater Southeast Community Hosp.,* 508 A.2d 927 (D.C.1986); *Pritchard v. Neal,* 139 Ga.App. 512, 229 S.E.2d 18 (1976); *Overstreet v. Nickelsen,* 170 Ga.App. 539, 317 S.E.2d 583 (1984); *Surgical Consultants, P.C. v. Ball,* 447 N.W.2d 676 (Iowa App. 1989); *Mayer v. Baisier,* 147 Ill.App.3d 150, 100 Ill.Dec. 649, 497 N.E.2d 827 (1986). *See, generally,* Annot., "Liability of physician who abandons case," 57 A.L.R.2d 432 (1958).

The Kansas Supreme Court explained abandonment in *Collins v. Meeker,* 198 Kan. 390, 424 P.2d 488 (1967), which reads:

"A physician has a right to withdraw from a case, but if he discontinues his services before the need for them is at an end, he is bound first to give due notice to the patient and afford the latter ample opportunity to secure other medical attendance of his choice. If a physician abandons a case without giving his patient such notice and opportunity to procure the services of another physician, his conduct may subject him to the consequences and liability resulting from abandonment of the case." 424 P.2d at 498 (quoting *Capps v. Valk,* 189 Kan. 287, 369 P.2d 238 (1962)).

The documents submitted in support of summary judgment and in response show that Dr. Hicks gave Sparks notice that he would no longer treat her. Although Sparks allegedly told her lawyer that she knew nothing about it, the hospital records clearly prove that *she requested Dr. Coates' office phone number because she was instructed to go to him for future treatment.* Moreover, the unrefuted documentation indicates that Dr. Hicks gave the names of several doctors to Sparks who practiced in the relevant area of medicine and that he even contacted them for her.

This documentation shows that Dr. Hicks gave reasonable notice of his termination of the physician-patient relationship to Sparks and that she had ample opportunity to procure the services of other physicians. There is no indication that Sparks was in a critical stage of treatment or that her condition was life-threatening. See: *Surgical Consultants P.C. v. Ball,* 447 N.W.2d 676 (Iowa App.

1989); *Overstreet v. Nickelsen,* 170 Ga.App. 539, 317 S.E.2d 583 (1984). Dr. Hicks did not abandon Sparks at a critical moment. Indeed, the evidentiary materials indicated that he was postponing the operation until the following week. It was not until the confrontation with Spark's son that Dr. Hicks severed his relationship with Sparks.

Having reviewed the evidentiary materials and all inferences and conclusions drawn therefrom in the light most favorable to Sparks, *Daugherty v. Farmers Coop. Ass'n,* 689 P.2d 947 (Okla.1984), we conclude that there is no substantial controversy as to any material fact and that Dr. Hicks and OST are entitled to judgment as a matter of law. *Daugherty, supra; First State Bank of Ketchum v. Diamond Plastics Corp.,* 891 P.2d 1262 (Okla.1995).

For the above and foregoing reasons, the opinion of the Court of Appeals is VACATED, and the judgment of the district court is AFFIRMED.

All the Justices concur.