Lawrence **JACKSON**

v.

**UNITED STATES of America.**

Civ. No. 11398.

United States District Court
D. Maryland.

April 19, 1960.

Marvin Ellin, Baltimore, Md., for plaintiff.

Leon H. A. Pierson, U. S. Atty., and Robert E. Cahill, Asst. U. S. Atty., Baltimore, Md., for defendant.

THOMSEN, Chief Judge.

This action under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346, 2671 et seq., filed 20 May 1959, presents a troublesome question of damages, made more difficult by the fact that plaintiff's counsel and witnesses have gilded his claim with deliberate exaggerations which must be scraped off before the underlying metal can be assayed.

The claim is based upon the alleged negligence of the doctors at the U.S.P.H.S. Hospital in Baltimore, who left a part of a surgical needle in plaintiff's abdomen during an operation in March 1954, and learned that the needle was there shortly thereafter, but did not inform the plaintiff thereof, or attempt to remove it. Plaintiff learned of the needle in May 1959, and it was removed in July 1959. Plaintiff had a variety of pains and difficulties between 1954 and 1959 for which he was treated at the Johns Hopkins Hospital as well as at the U.S. P.H.S. Hospital. The problem is—which of those pains and difficulties should be attributed to the needle?

Plaintiff, his counsel, and the United States Attorney have stipulated:

"1. That the United States of America admits that the acts and/or omissions of its agents, servants and employees in the voluntary treatment of the plaintiff, Lawrence Jackson, at the United States Public Health Service Hospital, Baltimore, Maryland, during the period from May 20, 1957, up to and including May 20, 1959, constituted negligent malfeasance and/or nonfeasance in that said agents, servants and employees of the United States of America, having knowledge of the presence of a curved atraumatic needle in the abdominal cavity of the said Lawrence Jackson, failed to disclose the same to the said Lawrence Jackson.

"2. That the plaintiff, Lawrence Jackson, admits that the United States of America is not liable under the Federal Tort Claims Act, Title 28, United States Code, Sections 1346(b), 2671 et seq., for the acts and/or omissions of its agents, servants and employees in the treatment of the said plaintiff, Lawrence Jackson at the United States Public Health Service Hospital, Baltimore, Maryland, which acts and/or omissions occurred prior to May 20, 1957."

Facts

The histories which plaintiff gave to the doctors at the Johns Hopkins Hospital and at the U.S.P.H.S. Hospital from time to time are essentially alike, but differ from the testimony of plaintiff and his witnesses on the stand. The following findings are based principally on the histories given at the two hospitals and on the records of the examinations and treatments.

Plaintiff is a Negro laborer, born in 1906, who came to Baltimore from Virginia in 1950 with his wife and ten children. He had had pains in his back and stomach for many years. He was treated in various clinics at the Johns Hopkins Hospital in 1951 and 1952 for bad teeth, heat exhaustion and a possible peptic ulcer. In February 1954, he went to the medical clinic at Hopkins, where he complained of his back and stomach, headaches and eye trouble. His teeth were so bad that they all had to be extracted. He had had several episodes of epigastric pain in recent years, had been unable to work for some time, and had lost nearly 20 pounds. His principal trouble was diagnosed as a probable peptic ulcer; since no bed was available at Hopkins he was sent to the U.S.P.H.S. Hospital, which admitted him as a "Special Study" case. After tests, the diag-

nosis was ulcer of the stomach, and on 30 March 1954 a government surgeon performed a subtotal gastrectomy and an appendectomy. About 75% of the stomach was excised and a Polya type of gastrojejunal anastomosis was carried out, connecting what was left of the stomach with the intestinal tract. The operation lasted about 3½ hours. The operation report, dated the following day, has the curious entry under the heading "Drains (kind and number)", simply "Half of atraumatic needle". This probably means that half of an atraumatic needle (curved surgical needle) had been recovered. There is no record of any effort to locate the other half.

The immediate post-operative course was uneventful, and the patient was discharged on 12 April 1954, with instructions about future diet. He reported to the U.S.P.H.S. Hospital on 10 May 1954 "eating OK and no vomiting—no pain". On 10 August 1954 he returned to the U.S.P.H.S. Hospital complaining that for the past two months he had been vomiting after each meal, had pain in his back, and had been unable to gain any strength. The admitting doctor noted, however, that his general appearance and weight-gain belied his complaints. He was readmitted to the U.S.P.H.S. Hospital, where he continued to complain of vomiting, although no objective evidence thereof was ever found. Nor was any satisfactory clinical evidence found to support the back complaint; plaintiff was not found to be malingering, but was considered able to work. On 24 February 1955 he still complained of his stomach and back, but had gained 10 pounds.

A few days later he went back to the Medical Care Clinic of the Johns Hopkins Hospital. Dr. Hedeman noted that "his back pain has been present 10 years but much worse since operation". An X-ray revealed the surgical needle "in vicinity of pain". Dr. Hedeman reported this to the U.S.P.H.S. Hospital and plaintiff returned to the U.S.P.H.S. Hospital clinic the next day. He said that his stomach was doing well, no vomiting but a little "gas". He complained of pain in the high lumbar region, but an examination by the Senior Orthopedic Surgeon showed no muscle spasm, no tenderness to palpation, and full range of motion in all directions. Straight leg raising tests were normal, and no orthopedic pathology was found.

On 29 March 1955 the doctors at the U.S.P.H.S. Hospital decided not to inform plaintiff that there was a foreign body in the peritoneal cavity. The note states: "We did not believe it was causing any symptoms". He was fitted with a back support, and reported a few weeks later, "Back feels much better. Stomach is fine now."

On 26 July 1955 he reported that his back began hurting again when he started doing pick and shovel work. This complaint was of a general soreness over the lumbar area. Again there was no muscle spasm and there was a full range of spinal flexion in all directions.

On 11 September 1955, he was admitted to the Johns Hopkins Hospital with "a few hours history of progressive supra-umbilical pain associated with nausea and vomiting". An exploratory laparotomy was performed, which showed a vascular occlusion of the terminal ileum due to post-operative adhesions. This condition was relieved by releasing the adhesions, and the bowel returned to normal promptly. No effort to remove the needle was made at that time or later by the Hopkins doctors, although they noted in the discharge summary that the needle "may be of importance in the future", and plaintiff was later checked in the neurosurgical clinic at Hopkins. No one has testified that the adhesions which caused the vascular occlusion were associated with the needle, and I find that they were not.

In March 1958 plaintiff returned to the U.S.P.H.S. Hospital complaining of headaches. He did not complain of nausea or vomiting. The X-ray showed arthritic changes which the doctors felt probably caused the pains. In May 1958 he failed to keep an appointment at the clinic and did not report back until 12 March

1959, when he complained of mid-lumbar back pain for the past month. He testified that he had hurt his back in an industrial accident on or about 15 February 1959. A belated report of such an accident was filed by his employer. The diagnosis at the clinic was lumbosacral strain.

In April 1959, he consulted his present attorney, who referred him to Dr. Allan H. Macht. Plaintiff gave Dr. Macht the details of the accident on 15 February 1959, said that his back hurt, and gave a history of "arthritis and ulcerated stomach". Dr. Macht had an X-ray taken by Dr. Sindler, which showed some arteriosclerotic calcification, mild hypertrophic arthritis in the lumbar spine, a spina bifida occulta, and the needle in the soft tissue in front of the third lumbar vertebra. Dr. Macht diagnosed plaintiff's condition as "sprain of the lower back". He reported the presence of the needle to plaintiff's attorney, who promptly told plaintiff and filed this action. Dr. Macht continued to treat plaintiff for his sprained back, and for some enlarged lymph nodes in his right groin.

Plaintiff was worried about possible cancer, and decided to have the needle removed. This was done at Sinai Hospital on 7 July 1959. The operation note shows that there was found "imbedded in scar tissue on the leading edge of the mid-transverse colon in the mesentery a ⅜th inch, curved, atraumatic, steel needle. The lymph nodes in this region [were] quite enlarged and edematous. There is some black discoloration around the needle and in the mesentery of the large bowel in this vicinity. The gastroenterostomy was intact." The pathological report referred to "lymph nodes from abdominal cavity showing some fibrosis", but there was no suggestion of malignancy. Plaintiff recovered his strength fairly quickly, and after the immediate post-operative course, stated that his abdomen felt much better, that he was not having the "bloating feeling" and gastric discomfort that he had had previously. His back was still bothering him, but mainly when the weather changed and if he tried to do any real heavy work. Dr. Macht felt plaintiff could have gone back to work in September 1959, but he continued to see and treat plaintiff for colds and other conditions up to the time of the trial.

Plaintiff testified that he now feels fine. He is taking soda to relieve his digestive discomfort. Because of the original operation he must eat small meals.

■ I find that the needle, the formation of the scar tissue around it, and the enlarged lymph nodes in the area, probably caused some part of the back pain from late 1954 until the needle was removed in July 1959, although the old back condition, hypertrophic arthritis, and the back sprain in February 1959, were also contributing factors. It is probable that the needle caused some pain in the middle and lower abdomen, although plaintiff did not complain of such pain to any considerable extent. It is possible, as Dr. Ebeling testified, that an autonomic, nervous reflex may have contributed to such nausea as plaintiff may have had, but it is noteworthy that plaintiff made no complaint of such nausea to the doctors at either Hopkins or the U.S. P.H.S. Hospital after 1955. The digestive symptoms, dizziness, etc., which plaintiff had in September 1954, and which his witnesses testified continued until 1959, were those of a typical "dumping syndrome", which follows a subtotal gastrectomy in about 10% of all cases. Plaintiff has not met the burden of showing that the needle caused any discomfort except some back pain and worry after 19 May 1957.

### Discussion

In the stipulation the government admits that it was negligent in failing to tell plaintiff about the needle during the period from 20 May 1957 to 20 May 1959. Plaintiff admits that the government is not liable in this action for any acts and/or omissions which occurred prior to 20 May 1957.

■ This stipulation is in accord with the applicable law. The limitation period in the Federal Tort Claims Act is

"two years after such claim accrues". 28 U.S.C.A. § 2401(b). Federal law governs the construction of the statute, including the meaning of the quoted language; state law governs what acts or omissions are negligent or wrongful and when the cause of action comes into existence. "A 'claim accrues' when it may be made the basis of a judicial action." Tessier v. United States, 1 Cir., 269 F.2d 305, 309, affirming D.C.D.Mass., 156 F.Supp. 32, 34 and D.C., 164 F.Supp. 779; United States v. Reid, 5 Cir., 251 F.2d 691.

It is debatable whether under the Maryland law any negligence during the original operation is shown by the evidence. Bettigole v. Diener, 210 Md. 537, 124 A.2d 265; Lane v. Calvert, 215 Md. 457, 138 A.2d 902; cf. Hunner v. Stevenson, 122 Md. 40, 89 A. 418; Jefferson v. United States, D.C.D.Md., 77 F.Supp. 706, affirmed 4 Cir., 178 F.2d 518, affirmed sub nom. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152. It was probably negligent not to have investigated the matter further by X-ray or otherwise when the "half of atraumatic needle" appeared in the drain. If there was any such negligence the cause of action therefor accrued under the Maryland law not later than the summer of 1954, when plaintiff claims he began to suffer from the effects of the needle. Hahn v. Claybrook, 130 Md. 179, 100 A. 83, L.R.A.1917C, 1169. See also, Pickett v. Aglinsky, 4 Cir., 110 F.2d 628 (W.Va. law); Tessier v. United States, supra; Anderegg v. United States, 4 Cir., 171 F.2d 127, certiorari denied 336 U.S. 967, 69 S.Ct. 937, 93 L.Ed. 1118. Here, as in Tessier, there was no fraudulent concealment of the cause of action. The decision of the government doctors in September 1955 not to tell Jackson about the needle was made in good faith. The doctors at Hopkins, who discovered the needle in the X-ray films, did not feel it was necessary to tell plaintiff about it, or to recover the needle when he was admitted to Hopkins for the operation to release the adhesions, or when he was sent to the neuro-surgical clinic thereafter. However, in view of plaintiff's continuing complaints of back pain after 1955, which I have found were contributed to by the presence of the needle, it was negligent not to have told plaintiff about the needle and not to have given him the choice whether or not to have it removed. The government has so stipulated. The government also concedes that it would have removed the needle in 1959 if plaintiff had asked the government to do so, and concedes liability for the reasonable cost of removing the needle and for any loss of wages during the recuperation period.

■ Plaintiff is entitled to recover for the following items:

1. Hospital bill at Sinai, $287.55; X-rays of Dr. Sindler, $85.00.

2. The reasonable charges of Dr. Macht for the discovery of the needle, the removal of the needle, and post-operative care, which I find to be $500. Plaintiff is not entitled to recover for the balance of the fifty visits to Dr. Macht's office for treatment for his back sprain, colds, family troubles, and the like, especially since it is admitted that Dr. Macht's bill has been deliberately enlarged because of the litigation.

3. Loss of wages during a reasonable period of recuperation, even though plaintiff would not have been able to work because of the industrial accident (back sprain), for which, incidentally, he has filed no claim under the Workmen's Compensation Act, Code 1957, art. 101, § 1 et seq. Three months seems an ample period for recuperation, since Dr. Macht felt plaintiff was able to return to work in September 1959. This item amounts to $676.

4. Back pain and worry from 20 May 1957 until the removal of the needle in July 1959, after which time plaintiff admits his pains and worries ended. A fair award for this is $3,000.

Let judgment be entered for plaintiff in the amount of $4,548.55.