Elsa H. NIXDORF, Plaintiff
and Appellant,

v.

N. Frederick HICKEN and A. James
McAllister, Defendants and
Respondents.

No. 16151.

Supreme Court of Utah.

May 27, 1980.

Edward M. Garrett, Salt Lake City, for plaintiff and appellant.

John H. Snow, Salt Lake City, for defendants and respondents.

MAUGHAN, Justice:

The plaintiff appeals the district court's granting of a directed verdict in favor of the defendants. Following the preservation of the plaintiff's case the defendants moved pursuant to Rule 50 for a directed verdict. The court granted the motion and entered its judgment thereon. We reverse and remand the action for a new trial. All statutory references are to Utah Code Annotated, 1953, as amended.

For a period of approximately ten years, the plaintiff, Elsa H. Nixdorf, suffered from a cystocele and rectocele.[1] In June 1964 she contacted the defendant, Dr. N. Frederick Hicken, concerning the alleviation of these problems.[2] Although Dr. Hicken initially counseled the plaintiff on the necessity of a hysterectomy, during the subsequent operation which he performed on June 5, 1964, he elected instead to merely repair the cystocele and rectocele and amputate a portion of the plaintiff's cervix.

The repair of the cystocele was completed without incident. However, during the repair of the rectocele one of the curved cutting needles used to suture the torn diaphragm became disengaged from the needleholder. Although the doctor realized the needle remained in the operating site, his attempts to locate it by palpating the suspect area were unsuccessful and the operation was completed without recovery of the lost needle.

Following the operation, the plaintiff remained under the care of Dr. Hicken until his retirement on July 1, 1970, when his partner, Dr. A. James McAllister, assumed

the plaintiff as his patient.[3] Notwithstanding the plaintiff's repeated complaints of pain in the pelvic-abdominal area, Dr. Hicken and Dr. McAllister never informed her of the presence of the needle. In fact, the plaintiff had no knowledge of the presence of the needle until 1976 when Dr. Robert Maddock, who she consulted because of lower abdominal pain, revealed its presence to her.[4]

At trial the plaintiff averred the defendant Hicken was negligent in the performance of the 1964 operation and because of his negligence, she has incurred certain damages, e. g., pain and suffering and related medical expenses. Plaintiff also averred the defendants acted negligently in not informing her of the presence of the needle.

At the conclusion of the plaintiff's case, the defendants moved pursuant to Rule 50, Utah Rules of Civil Procedure, for a directed verdict on the grounds the evidence presented by the plaintiff was insufficient as a matter of law to create a jury question on the defendants' negligence. The trial judge granted this motion on the basis of the plaintiff's failure to introduce expert testimony to establish the applicable standards of care.

█ In malpractice actions generally the physician is held to the standard of skill employed by his contemporaries in the same or similar communities. Therefore, before the plaintiff can prevail in a medical malpractice action, he must establish both the standard of care required of the defendant as a practicing physician in the community and the defendant's failure to employ that standard.

1. These terms refer to the bladder and rectum respectively and denominate a condition in which these organs protrude from the abdominal cavity through a rupture in the pelvic diaphragm and into the vaginal area.

2. The other defendant, Dr. James McAllister, was a partner of Dr. Hicken at the time of the operation and following Dr. Hicken's retirement assumed the plaintiff as a patient.

3. Although Dr. McAllister was not present at the original operation, the plaintiff's files contain the Operation Report which under the heading "Complications" states: "A small curved cutting needle was broken while repairing the rectocele and is apparently lying in the levator ani or the gluteus muscle or fascia on the left side . . ."

4. Dr. Maddock became aware of the needle from x-rays taken of the area for use in his care of the plaintiff.

In the majority of medical malpractice cases the plaintiff must introduce expert testimony to establish this standard of care. Expert testimony is required because the nature of the profession removes the particularities of its practice from the knowledge and understanding of the average citizen.

■ However, this Court has recognized certain exceptions to the general rule requiring expert testimony.[5] Specifically, expert testimony is unnecessary to establish the standard of care owed the plaintiff where the propriety of the treatment received is within the common knowledge and experience of the layman. The loss of a surgical instrument or other paraphernalia, in the operating site, exemplifies this type of treatment. We explained in *Fredrickson v. Maw*:[6]

> Whether a surgical operation was unskillfully or skillfully performed is a scientific question. If, however, a surgeon should lose the instrument with which he operates in the incision . . ., it would seem as a matter of common sense that scientific opinion could throw little light on the subject.

■ The loss of the surgical cutting needle by Hicken falls squarely within the perimeters of this exception to the general rule. The guidance provided by expert testimony is unnecessary in this situation and, therefore, expert testimony should not have been required to establish the professional standard of care under the facts of the present case.[7]

Concomitant with the establishment of the community standard is the plaintiff's proof that the defendant failed to exercise the level of skill this standard requires.

■ When the appropriate evidentiary basis is presented a plaintiff may employ the doctrine of res ipsa loquitur to carry this burden.[8] This doctrine establishes an inference of negligence from the circumstances incident to the operation.[9] It is a procedural rather than substantive rule of law which carries the plaintiff past a motion for nonsuit where the circumstantial evidence introduced by the plaintiff is sufficient to support the application of the doctrine and its inference of negligence.[10]

We delineated the evidentiary foundation which the plaintiff must establish before employing the doctrine of res ipsa loquitur in *Moore v. James*[11] when we stated:

> The rule . . . is applicable when: (1) The accident was of a kind which, in the ordinary course of events, would not have happened had the defendant used

---

5. See *Marsh v. Pemberton*, 10 Utah 2d 40, 347 P.2d 1108 (1959).

6. *Fredrickson v. Maw*, 119 Utah 385, 388, 227 P.2d 772, 773 (1951); quoting from *Wharton v. Warner*, 75 Wash. 470, 135 P. 235, 237 (1913); see also *Lipman v. Lustig*, 346 Mass. 182, 190 N.E.2d 675 (1963); *Taylor v. Milton*, 353 Mich. 421, 92 N.W.2d 57 (1958); *Ballance v. Dunnington*, 241 Mich. 383, 217 N.W. 329 (1928).

7. The trial court appeared to have overlooked the initial breach of the defendant's duty, i. e., the loss of the needle. The defendant's realization of the absence of the needle and his attempt to retrieve it does not obviate the consequences of its loss. Whether or not the defendant acted negligently in leaving the needle in the person of the plaintiff represents a separate issue. The plaintiff's failure to present a prima facie case on that issue does not eliminate the defendant's responsibility for the initial loss.

8. See *Talbot v. Dr. W. H. Groves' Latter-Day Saints Hospital*, 21 Utah 2d 73, 440 P.2d 872 (1968).

9. *Joseph v. Dr. W. H. Groves' Latter-Day Saints Hospital*, 10 Utah 2d 94, 348 P.2d 935 (1960). In *Joseph*, this Court set forth the basis for the application of res ipsa loquitur in malpractice actions when we explained: "The doctrine of res ipsa loquitur springs from the very practical process of drawing logical conclusions from circumstantial evidence. Its purpose is to permit one who suffers injury from something under the control of another, which ordinarily would not cause the injury except for the other's negligence, to present his grievance to a court or jury on the basis of the reasonable inferences to be drawn from such facts, even though he may be unable to present direct evidence of the other's negligence." 348 P.2d at 936.

10. *Turner v. Willis*, 59 Hawaii 319, 582 P.2d 710 (1978).

11. *Moore v. James*, 5 Utah 2d 91, 96, 297 P.2d 221, 224 (1956).

due care, (2) the instrument or thing causing the injury was at the time of the accident under the management and control of the defendant, and (3) the accident happened irrespective of any participation at the time by the plaintiff.

■ The establishment of this evidentiary basis presents a peculiar problem to a plaintiff in a medical malpractice case because of the necessity of showing what the usual outcome of a medical procedure would be when the required due care is employed. Generally, this requires the introduction of expert medical testimony to establish the fact the outcome is more likely the result of negligence than some other cause. This testimony would be necessary to provide the evidentiary basis from which the jury could conclude the result is more probably than not due to the negligence of the attending physician.[12]

■ However, in certain situations, the medical procedure is so common or the outcome so affronts our notions of medical propriety that expert testimony is not required to establish what would occur in the ordinary course of events. In this type of situation the plaintiff can rely on the common knowledge and understanding of laymen to establish this element.[13]

■ Therefore, when the instrumentality causing the injury is in the exclusive control of the defendant, and the plaintiff does not participate in the acts causing the injury, then negligence may be inferred from the injury alone if: (1) the cause of injury is so obviously negligent that negligence may be inferred as a matter of law; (2) people would know from common experience the result would not have happened without negligence; or (3) when a physician testifies bad results would not have occurred if proper care had been used.[14]

■ While we will not say the act of the defendant in losing the needle from the needleholder was negligent as a matter of law, the bad result, i. e., the needle present in the body of the plaintiff, is such that people would know from common knowledge and experience it is more probably than not the result of negligence.[15] Therefore, in the present case, expert testimony was not required to establish this element of the doctrine of res ipsa loquitur.

■ The evidence presented at trial indicates the instrumentality which caused the bad result was in the exclusive control of the defendant at the time of the accident. Furthermore, the plaintiff was under a general anesthetic and could not participate or contribute to the act causing the injury. These facts when combined with the nature of the accident provide a sufficient evidentiary foundation for the application of the res ipsa loquitur doctrine in

---

**12.** See *Talbot*, supra note 8, 440 P.2d at 873.

**13.** This Court has previously recognized this exception in *Fredrickson v. Maw*, supra note 6, 227 P.2d at 773, where we quoted: "So, in this case, where a surgeon loses a metallic spring . . . in the body of his patient, and fails to discover and remove it, it would seem that a jury would have abundant justification for inferring negligence without the aid of expert testimony." (Quoting from *Wharton v. Warner*, supra note 6, 135 P. at 237) Some courts limit the application of the doctrine of res ipsa loquitur exclusively to this type of situation. See *Swanson v. Hill*, 166 F.Supp. 296 (N.D.N.D. 1958). This appears to be a strict application of the doctrine requiring the result to "speak for itself" without the aid of any other proof. Thus, the application of the doctrine has sometimes been explained by courts as eliminating the necessity of the plaintiff's procurement of expert testimony in the initial stages of proof.

See *Dietze v. King*, 184 F.Supp. 944, 946 (E.D. Va.1960).

**14.** See *Tomei v. Henning*, 67 Cal.2d 319, 62 Cal.Rptr. 9, 431 P.2d 633 (1967).

**15.** See *Miller v. Kennedy*, 11 Wash.App. 272, 522 P.2d 852 (1974), approved and adapted, 85 Wash.2d 151, 530 P.2d 334 (1975); This case must be distinguished from the situations in which the needle is broken during the suturing. The malfunctioning of the surgical instruments presents an intervening cause for the accident beyond the control of the physician. In that situation the doctrine of res ipsa loquitur may still be applicable because the result is more probably than not the result of negligence, but the intervening cause may be used as a defense against the plaintiff's proof of proximate causation. The present situation is more analogous to the loss of whole instruments and other paraphernalia in the course of the operation.

this case. The application of the doctrine provides a rebuttable inference of negligence which will carry the plaintiff's case past the motion for nonsuit.[16]

 . Therefore, under the facts of this case, expert testimony was not required to establish the negligence of the defendant and the trial court erred in granting a directed verdict against the plaintiff because of the lack of that testimony.[17]

 The trial court also erred in not submitting to the jury the plaintiff's second cause of action, concerning the doctor's failure to disclose the presence of the needle. The relationship between a doctor and his patient creates a duty in the physician to disclose to his patient any material informa-

tion concerning the patient's physical condition. This duty to inform stems from the fiduciary nature of the relationship [18] and the patient's right to determine what shall or shall not be done with his body.[19]

 The scope of the duty is defined by the materiality of the information in the decisional process of an ordinary individual. If a reasonable person in the position of the plaintiff would consider the information important in choosing a course of treatment then the information is material and disclosure required.[20]

 Once the duty to disclose certain information is established, then the physician's total breach of that duty,[21] as found

16. See *Moore v. James*, supra note 11, 297 P.2d at 224; The defendant may introduce evidence to rebut the inference of negligence established by the application of the doctrine. While the defendant may introduce conflicting medical testimony on the cause of the accident this should not be relied upon by the trial judge to remove the case from the jury's consideration. Rather, this establishes a conflict in the evidence which it is the jury's duty to resolve.

17. The plaintiff also has the burden of proving the negligence of the defendant was the proximate cause of the injury. This proof requires some expert testimony in medical malpractice cases. *Anderson v. Nixon*, 104 Utah 262, 139 P.2d 216 (1943). In the present case the defendant, an acknowledged expert, testified the position of the needle was such that it could produce pain. Although there is contradictory evidence that the pain the plaintiff suffered was due to other medical abnormalities the testimony of the defendant is sufficient to render causation a question of fact to be determined by the jury. As we explained in *Anderson*, ". . . it is not necessary that the proximate cause of an injury sustained through the negligence of a doctor be proved with exactitude. . . .", and "If the injury sustained could be attributed to two or more causes, one of which was the negligence of the doctor, it would be a question for the jury to determine which was the proximate cause of the injury." Id. 139 P.2d at 220. See also *Forrest v. Eason*, 123 Utah 610, 261 P.2d 178 (1953); 13 A.L. R.2d, Proximate Causation—Malpractice, Actions, Section 2, page 22.

18. *Emmett v. Eastern Dispensary and Casualty Hospital*, 396 F.2d 931 (D.C. Cir. 1967) ("We find in the fiducial qualities of that relationship [between physician and patient] the physician's duty to reveal to the patient that which in his

best interests it is important that he should know." 396 F.2d at 935.)

19. *Schloendorff v. Society of New York Hospital*, 211 N.Y. 125, 105 N.E. 92 (1914); see also *Miller v. Kennedy*, supra note 15, 522 P.2d at 860. In *Miller* the court explained, "The patient is entitled to rely upon the physician to tell him what he needs to know about the condition of his own body. The patient has the right to chart his own destiny, and the doctor must supply the patient with the material facts the patient will need in order to intelligently chart that destiny with dignity."

20. The members of the jury can discern what a reasonable man would consider material information in a decision concerning his well being. Although there may be certain situations, such as the patient's incompetence or specific medical reasons for withholding material information where expert testimony may establish a defense for nondisclosure, it is not essential for the plaintiff's establishment of a prima facie case. See *Wilkinson v. Vesey*, 110 R.I. 606, 295 A.2d 676 (1972). ("The decision as to what is or is not material is a human judgment, in our opinion, which does not necessarily require the assistance of the medical profession." 295 A.2d at 688.) This objective approach has been accepted by some courts in the context of informed consent malpractice actions. See *Miller v. Kennedy*, supra note 15, 522 P.2d at 860. While analogy to the informed consent doctrine is helpful it is not dispositive. The present situation differs from that found in the informed consent context and our approach to it must reflect this difference. See *Canterbury v. Spence*, 464 F.2d 772, 782 (D.C. Cir. 1972).

21. *In Wilkinson*, supra note 20, 295 A.2d at 686, the court explained: "As explicated in

in the present case, presents to the jury the question of what damages were proximately caused by the breach. Where the physician fails to disclose to his patient any information concerning a material fact, there is no question of skill and judgment, no question of practice beyond the knowledge of laymen which must be established through expert testimony[22]. To borrow Justice Wiest's much quoted phrase from *Ballance*,[23] even the "merest tyro" would know the nondisclosure was improper.[24]

■ Damages which may be shown to follow as a proximate cause of the nondisclosure include reasonable charges for discovery and removal of the needle and monetary compensation for the mental anguish following the realization of the needle's presence.[25]

CROCKETT, WILKINS and HALL, JJ., concur.

STEWART, Justice (dissenting in part and concurring in part):

I respectfully dissent.

The majority, in my view, misapplies a common sense rule, applicable in simple malpractice fact situations, and arrives at a result which would allow the jury to find negligence in total ignorance of whether Dr. Hicken's conduct violated the applicable standard of care. Clearly this case falls within the scope of the rule that expert testimony in a medical malpractice case is necessary to establish proper standards of medical performance. In particular, the majority misapplies the rule that "loss of a surgical instrument or other paraphernalia, in the operating site, exemplifies [the] type of treatment" that is "within the common knowledge and experience of the layman." *Marsh v. Pemberton*, 10 Utah 2d 40, 347 P.2d 1108 (1959). In short, the plaintiff's failure to produce expert testimony as to the standard of care will necessarily mean that a verdict is based on speculation.

It is an unrealistic rule that holds in all cases abandonment of a surgical instrument or other paraphernalia in a person during the course of an operation can be considered negligence by a lay person without regard for the nature of the surgical procedures involved. It need hardly be reiterated that a physician is not a guarantor of the results of an operation. *Marsh v. Pemberton, supra.* Nor does he warrant against all accidents which may occur during surgical procedures. The basis for fastening liability on a defendant in a malpractice suit is negligence, not the occurrence of an untoward circumstance. In the instant case, the sur-

*Collins v. Meeker*, 198 Kan. 390, 424 P.2d 488 (1967), the *Natanson* [*Natanson v. Kline*, 186 Kan. 393, 350 P.2d 1093 (1960)] rule provides . . . that where a physician is silent and makes no disclosure whatever, he has failed in the duty owed to the patient and the patient is not required to produce expert testimony to show that the doctor's failure was contrary to accepted medical practice . . . ."

22. In determining the existence and the extent of a physician's duty to disclose in each particular situation, the jury need not depend exclusively on expert testimony. In nondisclosure cases the jury is not invariably functioning in an area of such technical complexity that it is bound to medical custom, as established through expert testimony, as an inexorable application of the community standard of reasonable care. *Canterbury v. Spence*, 464 F.2d 772, 785 (D.C. Cir. 1972). In *Canterbury* the court in discussing the basis of disclosure required in the informed consent context explained: "Nor can we ignore the fact that to bind the disclosure obligation to medical usage is to abrogate the decision on revelation to the physician alone. Respect for the patient's right of self determination on particular therapy demands a standard set by law for physicians rather than one which the physicians may or may not impose upon themselves." 464 F.2d at 784.

23. *Ballance v. Dunnington*, supra note 6, 217 N.W. at 330.

24. See *Taylor v. Milton*, supra note 6; the present factual situation could also be used to establish a cause of action in fraudulent concealment. Where a physician has knowledge of a fact concerning the patient's physical condition which is material to that patient and he fails to disclose it the confidence relationship between them creates a duty to disclose which may render his silence fraudulent. See *Hudson v. Moore*, 239 Ala. 130, 194 So. 147 (1940).

25. See *Jackson v. United States*, 182 F.Supp. 907 (D.C.Md.1960); *Houston Clinic v. Busch*, 64 S.W.2d 1103 (Tex.Civ.App.1933).

gical operation was not perhaps as unusual and complex as some of the advanced procedures now being used, but it clearly was of such a nature that application of the *Marsh* rule is inappropriate, and there is no evidence in the record which indicates that Dr. Hicken was negligent at all. There is even evidence that Dr. Hicken's conduct may not have been the actual cause of the loss of the cutting instrument in the plaintiff. He testified that in operations of the type he performed on the plaintiff the surgical instrument sometimes breaks just below the eye through which the catgut thread is passed and that, given the nature of the operation, sound medical judgment often dictates leaving the instrument in the body if it cannot be readily located.

The inappropriateness of the legal rule applied by the majority is demonstrated by the testimony of Dr. Hicken. Operating inside a body cavity, he could not see what he was doing and had to orient his actions primarily by touch. He described the problems relating to the loss of the needle as follows:

A. Well, you are working down there, [inside the vagina], you have the retractors in and you have—you're bringing this [i. e., the needle] around on one side of the tissue and trying to bring it around and all at once you don't have ahold of the needle and then the thing you do, you have to bring your forceps back out, then you poke—use your lights and you look in there to see if you can see it. You put your glove finger in and you try to palpate it to see if you can feel it and as a general rule one can feel and in knowing the exact area in which you were working, one can generally feel where the suture is or the needle is. In this case, we did not find it.

Q. All right. Now, for that needle to become loose from the holder that ratchet could be disengaged, did it not?

A. Well, the ratchet could be disengaged but the needle—by far the more common way of losing a needle in this operation is, you are working up in there —see, *I told you, you put your finger here as a guide to exert a little pressure as you bring it around. You are working in a zone that has blood. There is fat. That means there is oils and it's possible for this to just rotate and slip out of the needle holder. That's the usual thing that happens.*

The needle may also break off because of a defect in the needle itself or because of the forceps or other holding implement. Dr. Hicken stated:

For instance, we have no way of knowing whether the needle was whole or broken. From experience in handling these things, where the thread goes through the needle it is very thin and frequently a needle will break at that part but—and you have a little—just a splinter of the eye of the needle left and separates from the main shaft of the needle and when you pull your hemostat back you have nothing. Both the eye of the needle and the main curved needle still remains in situ. That means in position in the area in which you are working.

Loss of the needle could also occur for other reasons.

You are getting a bite of tissue—you are coming down and getting a bite of tissue—you see, here's a ratchet that locks it. I showed you yesterday. Now, when you are sewing, you do not have your fingers in these openings of the ratchet. You take your hand out and put it against the palm here using this finger to give you a little force and a directional mechanism for the point of the needle and you come around like this. Now, sometimes you hit heavy muscles, sometimes you have thinner muscles, sometimes you have scar tissue. If the bladder and things have been out too long, that tissue has been irritated and there is a lot of scar tissue until you get some resistance in bringing the needle through and it's very easy for the—possible that the needle, being in oil and blood and fatty tissue down there, too, that the needle could rotate and slip out. When we bring the needle—when we brought the needle holder out it was still locked

and the needle wasn't in it so that's why you assume that the needle was broken or lost.

The doctor was well aware of the relative hazards of searching further for the lost needle as opposed to leaving it within the body cavity. He consciously made a medical judgment as to which course of action would result in the least risks to the patient. He testified:

Well, because this woman was elderly. She was not in the best physical condition. We had had her on the operating table for one hour and to get X-ray machines at that time—we are talking about fourteen years ago—at that time we had to get X-ray machines from the basement up into the operating room and it would take too much time to complete that sort of a procedure and the second thing is that from my experience in such cases and from being very conversant with literature on this subject, as I was a Professor and teacher in medical schools, I knew that a needle left in this particular area was not particularly harmful to the patient. It is common knowledge that we leave metal in the pelvic area very frequently. Now, for example, in some of our operations instead of using sutures and ties to tie around bleeding blood vessels, we have an instrument that we go in there and we put a metal clip on that blood vessel because it's easier to do, it's quicker to do and it is innocuous.

This testimony, in my view, destroys the necessary foundation for application of the rule that loss of a surgical instrument in a body establishes, without more, an inference of negligence. Nor do the facts provide a foundation for application of the doctrine of *res ipsa loquitur*. As this Court stated in *Joseph v. W. H. Groves Latter-Day Saints Hospital*, 10 Utah 2d 94, 348 P.2d 935 (1960):

[I]t is realized that res ipsa loquitur has been applied in various fields where an injury occurs which is not to be expected if proper standards of care and skill are observed. *But this is done only with caution, particularly in the medical field* *because of the realization that many aspects of the treatment of human ills cannot yet be regarded as exact science and a bad result may obtain even though recognized standards of care and skill are employed.* [10 Utah 2d at 99, 348 P.2d at 938.] [Emphasis added.]

I recognize that there is a ring of common sense to the proposition that leaving foreign objects in a person constitutes negligence, see *Fredrickson v. Maw*, 119 Utah 385, 227 P.2d 772 (1951), but neither justice nor common sense are enhanced by the mechanistic application of a rule of law to a fact situation that is only superficially related to the type of situation the rule was intended to govern. In this case, I cannot see how a jury could possibly find negligence in light of Dr. Hicken's testimony and in the absence of any contrary expert testimony. I think the trial judge was right in directing a verdict on this issue.

I concur, however, with the majority that the defendants had a duty to inform the plaintiff of the fact that a foreign object had been left in her body.