**VIRGINIA S., Individually, and as Guardian ad Litem of T.W., an Incompetent Person, Plaintiff and Appellant,**

v.

**SALT LAKE CARE CENTER, Defendant and Respondent.**

No. 860015–CA.

Court of Appeals of Utah.

Aug. 27, 1987.

David J. Knowlton, Ogden, Benjamin P. Knowlton, Salt Lake City, for plaintiff-appellant.

Scott W. Christensen, Salt Lake City, for defendant-respondent.

Before BILLINGS, GARFF and JACKSON, JJ.

## OPINION

GARFF, Judge:

This appeal is brought by plaintiff Virginia S.(S.), mother and guardian ad litem of T.W., from a directed verdict in favor of defendant Salt Lake Care Center (Care Center).

T.W. was seventeen years old when she was admitted to the Care Center in August of 1979. At that time she suffered from neuro-degenerative disease, severe mental retardation, progressive dementia, seizures, muscle weakness, and failing sight and hearing. During her stay at the Care Center she experienced periods of improvement, during which she was able to walk, feed herself, control excretory functions, follow simple directions, recognize her mother, appreciate music, and communicate to a limited degree. She also experienced periods of deterioration during which she was unable to perform these minimal activities or control bouts of irrationality and violence. When she was physically able to do so, she was free to leave her bed, and, on one occasion, ran away from the Care Center for twelve hours. She was unable to use the Care Center's bell system to call for assistance and required constant supervision. During her entire stay at the Care Center, T.W. was incapable of consenting to sexual intercourse.

In September 1981, the Care Center notified S. that T.W. was pregnant. The identity of the person who raped her and the exact circumstances under which the rape occurred were never established.

After T.W. gave birth to her daughter, S., as guardian ad litem, sued the Care Center for negligence, relying on the doctrine of res ipsa loquitur. At the close of the trial, for reasons not stated in the record, the district court granted the Care Center's motion for directed verdict.

In reviewing the directed verdict, "[w]e must examine the evidence in the light most favorable to the losing party, and if there is a reasonable basis in the evidence and in the inferences to be drawn therefrom that would support a judgment in favor of the losing party, the directed verdict cannot be sustained." *Management Comm. of Graystone Pines Homeowners Ass'n v. Graystone Pines, Inc.*, 652 P.2d 896, 898 (Utah 1982). We conclude, as a matter of law, that reasonable minds could differ on the facts as determined from the evidence, and, therefore, the trial court erred in directing a verdict.

The doctrine of res ipsa loquitur is an evidentiary doctrine used in a negligence action to establish the defendant's duty of care and the breach of that duty. *Robinson v. Intermountain Health Care, Inc.*, 740 P.2d 262, 264 (Utah App.1987). To rely on this doctrine, the plaintiff must establish a sufficient evidentiary foundation to support application of the doctrine and its inference of negligence. The Utah Supreme Court has articulated the circumstances that supply such a foundation:

> The rule ... is applicable when: (1) The accident was of a kind which, in the ordinary course of events, would not have happened had the defendant used due care, (2) the instrument or thing causing the injury was at the time of the accident under the management and control of the defendant, and (3) the accident happened irrespective of any participation by the plaintiff.

*Id.* at 265, (citing *Moore v. James*, 5 Utah 2d 91, 96, 297 P.2d 221, 224 (1956). These elements "are not rules that must be rigidly applied in all cases, but [are] guidelines for the type of circumstantial evidence that can be used to make out a prima facie case of negligence." *Ballow v. Monroe*, 699 P.2d 719, 721 (Utah 1985). Once the ele-ments of res ipsa loquitur have been established, the plaintiff is entitled to a res ipsa loquitur jury instruction, and it becomes the jury's function, not the trial court's, to weigh conflicting evidence. *Kusy v. K–Mart Apparel Fashion Corp.*, 681 P.2d 1232, 1235 (Utah 1984). In the context of a directed verdict, the plaintiff's entitlement to a jury determination upon establishment of a prima facie case is particularly significant.

To establish a prima facie res ipsa loquitur case sufficient to entitle her to come before the jury, S. was required to show that: (1) T.W.'s rape and resulting pregnancy were the sort of events, which, in the ordinary course of events, would not have happened had the Care Center used due care; (2) T.W. was under the Care Center's exclusive control at the time the rape occurred and, therefore, access to T.W. by the man who injured her was also under the Care Center's control; and (3) the rape occurred irrespective of T.W.'s participation.

### I.

S. established the first element in two ways: 1) the common knowledge exception to the requirement for expert testimony in medical malpractice cases, and 2) expert testimony that the Care Center breached the standard of care required of nursing homes.

In medical malpractice cases, expert testimony is generally required to establish the standard of care "because the nature of the profession removes the particularities of its practice from the knowledge and understanding of the average citizen." *Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980). However, in circumstances "where the propriety of the treatment received is within the common knowledge and experience of the layman," expert testimony is not necessary to establish the professional standard of care. *Id.* "[I]n certain situations, ... the outcome so affronts our notions of medical propriety that expert testimony is not required.... In this type of situation, the plaintiff can rely on the com-

mon knowledge and understanding of laymen to establish this element." *Id.* at 353.[1]

In the present case, where a mentally and physically incapacitated seventeen-year-old girl was raped while under the care and custody of the defendant nursing home, there are no medical technicalities involved that call for expert testimony to determine whether the nursing home breached its standard of care.

Plaintiff proferred the testimony of Dr. Steven Nance, T.W.'s obstetrician, that defendant breached the applicable standard of care for hospitals and medical care facilities in general when it allowed T.W. to be raped while residing in the nursing home. The trial court disallowed Dr. Nance's testimony on the ground that he did not have sufficient experience with nursing homes to qualify as an expert on the standard of care applicable to nursing homes. However, as an obstetrician working in a hospital setting, he is qualified to comment on the standard of care applicable to hospitals, which is similar to that required of nursing homes. "[The] degree of care which a nursing home owes to its patients is similar to that owed by a hospital to its patients." *Lemoine v. Insurance Co. of North America,* 499 So.2d 1004, 1007 (La.App.1986).

Staff records from the Care Center indicate that several months prior to T.W.'s rape, she ran away from the nursing home and was missing for twelve hours. These records, combined with Care Center employees' specific testimony that T.W. needed constant supervision, demonstrate that if T.W. had been given the supervision that the nursing home staff knew she required, her rape and pregnancy would not have occurred. T.W.'s attending physician, Dr. Matsuo, testified as an expert witness regarding the applicable standard of care for nursing homes and whether defendant had breached that standard. His testimony was somewhat noncommittal and vascillated, depending on which attorney was asking him questions. The seeming contradictions in his testimony should not have precluded its use in establishing that defendant breached the standard of care required of nursing homes, but should have been resolved by the jury. *See Nixdorf v. Hicken,* 612 P.2d 348, 354 n. 16 (Utah 1980).

While many cases support the Care Center's argument that nursing homes, hospitals, and other medical caretakers have no duty to give constant supervision to their patients, these same cases require that supervision be tailored to the known needs of the patients. "Although a nursing home is not the insurer of the safety of its patients, nevertheless, it is the duty of the nursing home to provide a reasonable standard of care taking into account the patient's mental and physical condition." *Lemoine,* 499 So.2d at 1007.[2]

Viewing the evidence in the light most favorable to the plaintiff, whether consider-

1. *Accord Juhnke v. Evangelical Lutheran Good Samaritan Soc'y,* 6 Kan.App.2d 744, 634 P.2d 1132 (1981) (no expert testimony needed to establish a breach of the professional standard of care when a nursing home patient was assaulted by another patient); *Golden Villa Nursing Home v. Smith,* 674 S.W.2d 343 (Tex.App.1984) (when an unattended nursing home patient was injured on a highway adjacent to the nursing home, there was no need for expert testimony to establish a breach in the nursing home's duty of care).

2. *See also McGillivray v. Rapides Iberia Management Enterprises,* 493 So.2d 819, (La.App. 1986) (nursing home breached the standard of care when its 69 year-old patient, suffering from senility, hardening of the arteries, diabetes, and deteriorating eyesight, wandered out of the facility into 42 degree weather at 4:00 a.m. wearing socks, shorts, and his pajama top); *Golden*

*Villa v. Smith,* 674 S.W.2d 343 (Tex.App.1984) (nursing home breached the standard of care when 68 year-old patient, suffering from schizophrenia, senility, non-psychotic brain syndrome, and with a known tendency to wander, was left unsupervised for 55 minutes and ran from the nursing home onto a highway, hitting a passing motorcyclist); *Gunn v. Hi-C Home, Inc.,* 260 Or. 404, 490 P.2d 999 (1971) (nursing home breached its standard of care when it failed to foresee that the noise of a water pump in a fountain would startle an 80 year-old patient who needed a cane to walk, causing her to fall and break her hip); *Booty v. Kentwood Manor Nursing Home, Inc.,* 483 So.2d 634 (La.App.1985) (nursing home had a duty to prevent an 80 year-old senile patient with a known tendency to wander from falling down outside the nursing home. A nurse's and attendant's contact with the patient 15 minutes prior to the fall did not satisfy the standard of care set by the court).

ing the expert testimonies of Dr. Matsuo and Dr. Nance or the common knowledge of the jurors, there appears to be sufficient evidence to show that defendant breached the relevant standard of care. Considering the nursing home staff's awareness of T.W.'s need for constant supervision, her inability to operate the bell system to summon assistance, and her physical and mental incapacity to protect herself from assault, the jury could reasonably have found that the Care Center breached its standard of care and was negligent in failing to prevent the rape. "The duty owed by a nursing home is of ordinary care, but special facts and circumstances, either known or discoverable by exercising reasonable care, will give this duty a broader scope than it would otherwise have." *May v. Triple C Convalescent Centers*, 19 Wash. App. 794, 578 P.2d 541, 543 (1978).

## II

The second element of res ipsa loquitur requires S. to show that T.W. and, thus, the perpetrator, were under the Care Center's exclusive control at the time the rape occurred. *See Ballow v. Monroe*, 699 P.2d 719, 721 (Utah 1985); *Robinson v. Intermountain Health Care*, 740 P.2d 262, 264 (Utah App.1987).

In arguing for affirmation of the trial court's directed verdict, the Care Center claims that T.W.'s absence from its premises during her visits to her mother and various doctors foreclosed a finding of their exclusive management of T.W. and, thus, precluded application of the doctrine of res ipsa loquitur. However,

> the second factor, exclusive management or control, is not necessarily a *sine qua non* of the doctrine but may establish that it is more likely than not that the defendant was the party responsible for the injury. Something less than exclusive control of the instrumentality causing the damage may be sufficient if the evidence demonstrates the probability that the defendant was responsible for the damage caused.

*Ballow*, 699 P.2d at 721. *See also Wightman v. Mountain Fuel Supply Co.*, 5 Utah 2d 373, 302 P.2d 471, 473 (Utah 1956).

Furthermore, "[t]he control necessary for a res ipsa instruction is control exercised at the time of the negligent act." *Kusy v. K–Mart Apparel Fashion Corp.*, 681 P.2d 1232, 1235 (Utah 1984). The critical issues are when did T.W. conceive and was she within the Care Center's control at that time.

To facilitate T.W.'s medical treatment, the Care Center's resident physician's orders for T.W. indicated that "[s]pecific leave of absence for day pass may be granted with responsible person *according to Salt Lake Care Center Policy*." (Emphasis added.) Accordingly, T.W. was taken periodically to visit clinics and doctors outside the Care Center. The Care Center made transportation arrangements for these visits, usually with commercial transportation such as Ambucar. However S. and her daughter, at the Care Center's request and without executing a release form, provided transportation for T.W. on several occasions. Such transportation to medical appointments is part of the Care Center's responsibility in providing the kind of supervision, medical care, and treatment consistent with the level of nursing care prescribed by Dr. Matsuo for T.W.

Dr. Matsuo instructed the Care Center that T.W. "may visit home, *if approved by the care center*." (Emphasis added.) The Care Center required S. to execute a release form absolving it from responsibility for T.W. while she was in S.'s custody, when S. took T.W. from the Care Center for home visits. Aside from the visits to outside doctors and clinics, S. never gave permission for anyone else to take T.W. from the Care Center. Therefore, unless T.W. was released into S.'s custody according to the Care Center's policy, the Care Center retained control over and responsibility for T.W. twenty-four hours a day and was obligated to see that she got safely to and from her visits to doctors and clinics.

The Care Center's records indicate that T.W.'s last menstrual period began on March 27, 1981, placing the date of concep-

tion near April 10, 1981. Dr. Nance testified that the date of conception was about April 8, 1981.

Release forms signed by S. indicate that S. had custody of T.W. on April 3, 5, and 10, 1981. Nursing records show that T.W. had two leaves of absence in April 1981: an unspecified one on April 13, and one to her speech therapist on April 28. Dr. Matsuo's records indicate that T.W. visited his office in February and May, but not in March and April. Nothing in the patient progress notes maintained by the Care Center indicate any other absence from the Care Center in April.

S. testified that while she had custody of T.W., T.W. was never out of her sight except when S. used the bathroom, that she never left T.W. with a male or allowed her to participate in sexual activity, and that T.W. was never left alone. On one occasion, when circumstances prevented S. from returning T.W. to the Care Center for the night, and she was required to keep her at home overnight, S. testified that T.W. slept with her in her bed and was thereby under her supervision.

Examining the evidence and the inferences therefrom in the light most favorable to the plaintiff, we conclude that there is an issue of fact that should have gone to the jury: whether the perpetrator raped T.W. while she was under the management and control of the Care Center, or whether she was under S.'s control at the time of the rape.

### III

The third element of res ipsa loquitur requires S. to show that T.W. did not bring the injury upon herself. *Ballow v. Monroe*, 699 P.2d at 721; *Robinson v. Intermountain Health Care, Inc.*, 740 P.2d at 264.

Both Dr. Nance and Dr. Matsuo testified that T.W. was not capable of consenting to sexual intercourse. From the record, it is overwhelmingly obvious that physically, emotionally, and mentally, she was incapable of consent.

Sufficient evidence was presented to make a prima facie showing of each element of res ipsa loquitur, so S. was entitled to the jury's evaluation of the evidence. *See Kusy v. K-Mart Apparel Fashion Corp.*, 681 P.2d at 1235. Therefore, the district court's judgment is reversed, and the case is remanded for a new trial consistent with this opinion.

Costs to appellant.

BILLINGS and JACKSON, JJ., concur.