**2023 UT App 123**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
ANTHONY JASON ALVARADO,
Appellant.

Opinion
No. 20210416-CA
Filed October 13, 2023

Eighth District Court, Duchesne Department
The Honorable Samuel P. Chiara
No. 201800128

Emily Adams, Freyja Johnson, and Scott Goodwin,
Attorneys for Appellant, assisted by law students
Brandon Graves, Adam Reed Moore, Annie
Carmack, and Danna Radford[1]

Sean D. Reyes and David A. Simpson,
Attorneys for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1 Anthony Jason Alvarado appeals his two convictions for failure to stop at the command of a police officer. He argues that his trial counsel (Counsel) rendered deficient performance in two respects related to the jury instructions and that he was thereby prejudiced. We agree with the first of Alvarado's arguments, and we therefore reverse his conviction on one charge and remand the

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice in the courts of Utah).

matter to the trial court for a new trial on that charge. We affirm Alvarado's conviction on the other charge.

## BACKGROUND[2]

¶2 In the early morning hours of April 22, 2020, in Roosevelt, Utah, a police officer (Patrol Officer) was seated in his car on stationary patrol when he heard "an engine rev up like it was speeding or accelerating hard." Looking for the source of the noise, Patrol Officer saw a "red Ford pickup" come past him and, without signaling, turn left at the intersection "at a pretty good rate of speed." Patrol Officer activated his emergency lights and tried to pull the truck over. However, the truck did not stop and instead "accelerated more." Patrol Officer briefly pursued, reaching a speed of at least sixty miles per hour, and then saw the truck make a "really hard, fast turn" into a cul-de-sac in a trailer park, nearly hit a tree and a parked car, and finally come to a stop. Patrol Officer pulled behind the truck and saw the driver exit the vehicle and run away. Patrol Officer attempted to pursue the driver on foot but lost sight of him.

¶3 Patrol Officer then returned to the truck to be sure there was no one else inside it and radioed dispatch to give a description of the driver—a man dressed in "a green or a gray shirt with jeans." Dispatch ran the license plate of the truck and determined that it belonged to Alvarado. Shortly thereafter, a second police officer in the area (Backup Officer) located and detained a man—Alvarado—who matched Patrol Officer's description of the driver. The officers identified and searched Alvarado, finding no truck key, and placed him under arrest.

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Gallegos*, 2020 UT 19, n.1, 463 P.3d 641 (cleaned up).

¶4 Because Alvarado smelled of alcohol and was staggering, the officers took him to the hospital for a medical clearance before transporting him to jail. The officers also procured a warrant to obtain a blood alcohol test, which revealed that Alvarado's blood alcohol level was about four times the legal limit. While the officers were standing just outside of Alvarado's hospital room, Backup Officer heard Alvarado—who had generally been "kind of mouthy . . . and arrogant and noncooperative"—say, "[Y]ou guys are lucky that I pulled over or else you would have never caught me."

¶5 Alvarado was charged with two different failure-to-stop crimes: one based on his failure to stop when Patrol Officer attempted to pull him over (fleeing by vehicle), *see* Utah Code § 41-6a-210, and one based on his fleeing the scene after exiting the truck to avoid arrest (fleeing on foot), *see id.* § 76-8-305.5.

¶6 In April 2021, a jury trial was held, during which the two officers testified to the facts as set forth above. On cross-examination, Counsel asked Patrol Officer whether he had activated either his body-worn camera or the dashboard camera of his vehicle during the episode with Alvarado—emphasizing that those were "the very things that could prove [Patrol Officer's] identification of [Alvarado]." Patrol Officer acknowledged the significance of video evidence but admitted that he had not activated his body-worn camera, and he testified that he could not remember if his police vehicle was equipped with a dashboard camera.

¶7 Alvarado presented one witness in his defense: a friend (Friend) who lived in the trailer park and claimed to have witnessed him exiting his truck that night. Friend testified that she actually saw two people exit Alvarado's truck—a man she did not recognize, who exited from the driver's door, and Alvarado, who exited from the passenger side. She related that she then saw both men run past her trailer and that shortly thereafter she saw a

police car pulling into the trailer park. At that point, Friend said, she "just shut the window and quit looking out," generally not wanting to be involved, although she did cooperate with police when later approached.

¶8 In its closing argument, the State largely focused on the credibility of the witnesses, contrasting the potential biases of Patrol Officer—who, again, had testified to witnessing a person dressed like Alvarado exit the driver's side of the truck—and Friend—who had testified to witnessing Alvarado exit the passenger side of the truck. The State argued that Friend's testimony was "just not credible" because of her location in relation to Alvarado's truck and the sources of light. The State also asserted that Friend "ha[d] an incentive" to lie because of the close relationship between Alvarado and Friend: "[Alvarado's] own wife or girlfriend thought that he was cheating on her with [Friend]." The State argued that the officers, on the other hand, had "no bias" and "no incentive to come in here and lie." The State also downplayed the lack of body-worn camera footage:

> Would I have loved to have body cam here[?] [S]ure.
> . . . [Y]ou would have seen every bit of it if I had it.
> But we just don't have that all the time. It's just not
> something that exists all the time. And . . . I wish we
> had it, . . . but it's not relevant.

¶9 Counsel's closing argument emphasized the lack of evidence, particularly any "fundamental" camera footage from a dashboard camera or body-worn camera. Counsel also reminded the jury that Friend was cooperative with police—calling this "a hallmark of somebody that is telling the truth"—and suggested that Friend would not "risk perjury or any type of a criminal charge by lying on the stand." Counsel concluded by arguing that this case was the product of a "keystone cops operation" that did not produce evidence sufficient to support the charges.

¶10   The jury was given instructions to guide its deliberations, including instructions setting forth statutory elements of the crimes with which Alvarado was charged. Counsel did not object to these elements instructions. Nor did he request any instruction related to Patrol Officer's failure to activate his body-worn camera, although such an instruction is permitted by statute in certain circumstances.

¶11   After deliberating, the jury returned guilty verdicts on both charges. Alvarado was later sentenced to suspended prison and jail terms and placed on probation. Alvarado now appeals.

## ISSUES AND STANDARD OF REVIEW

¶12   Alvarado raises two claims of ineffective assistance of counsel. His first claim is based on Counsel's failure to request an adverse inference jury instruction due to Patrol Officer's failure to activate his body-worn camera. Alvarado's second claim is based on Counsel's failure to object to the jury instructions, which, he contends, failed to set forth the relevant mens rea for the charged crimes. "When a claim of ineffective assistance of counsel is raised for the first time on appeal, there is no lower court ruling to review and we must decide whether the defendant was deprived of the effective assistance of counsel as a matter of law." *Layton City v. Carr*, 2014 UT App 227, ¶ 6, 336 P.3d 587 (cleaned up).

## ANALYSIS

¶13   To succeed on a claim of ineffective assistance of counsel, the defendant must establish both requirements set forth by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "Both elements must be present, and if either is lacking, the claim

fails and the court need not address the other." *State v. Nelson*, 2015 UT 62, ¶ 12, 355 P.3d 1031.

¶14 To show deficient performance of counsel, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. In making this assessment, we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

¶15 To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* And in assessing the likely impact of a particular error, we must "consider the totality of the evidence before the judge or jury" since "[s]ome errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect." *Id.* at 695–96. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

## I. Adverse Inference Jury Instruction

¶16 Alvarado argues that Counsel performed deficiently by not requesting an adverse inference jury instruction due to Patrol Officer's failure to activate his body-worn camera. Alvarado also argues that had such an instruction been requested, it likely would have been given and that if the instruction had been given, there is a reasonable probability that the jury's verdict on the fleeing by vehicle charge would have been different. We agree.

¶17 In 2016, the Utah Legislature enacted Utah Code section 77-7a-104, under which police officers are required to, when possible,

activate their body-worn cameras[3] before any law enforcement encounter.[4] *See* Utah Code § 77-7a-104(4) ("An officer shall activate the body-worn camera prior to any law enforcement encounter, or as soon as reasonably possible."); *see also* Act of Mar. 10, 2016, ch. 410, § 6, 2016 Utah Laws 2481, 2485. At that time, however, the legislature provided no direction should a law enforcement officer not comply with section 77-7a-104. Then in 2020, the legislature enacted Utah Code section 77-7a-104.1 (the Adverse Inference Statute), which provides that if an officer fails to comply with section 77-7a-104, the trial court is allowed to "direct[] the jury that an officer's failure to comply . . . may give rise to an adverse inference against the officer." Utah Code § 77-7a-104.1(1); *see also* Act of Mar. 12, 2020, ch. 404, § 2, 2020 Utah Laws 3245, 3246.[5] The Adverse Inference Statute also says that "[i]f a court includes an adverse inference instruction, the prosecutor shall, after the conclusion of the trial, send written

---

3. Neither section 77-7a-104 nor any other part of chapter 7a, which addresses law enforcement use of body-worn cameras, requires all law enforcement agencies in the state to use body-worn cameras. *See* Utah Code §§ 77-7a-101 to -107. But chapter 7a does require any agencies that choose to use body-worn cameras to have a "written policy governing the use of body-worn cameras that is consistent with" the minimum requirements set forth in that chapter of the code. *Id.* § 77-7a-102(1), (2).

4. The statutory definition of a "law enforcement encounter" includes "a traffic stop." Utah Code § 77-7a-103(3)(f).

5. Section 77-7a-104 was amended at the same time that the Adverse Inference Statute was enacted, *see* Act of Mar. 12, 2020, ch. 404, § 2, 2020 Utah Laws 3245, 3245–46, but the relevant provision in that section—the requirement to activate the body-worn camera—has remained unchanged since its original enactment in 2016, *see* Act of Mar. 10, 2016, ch. 410, § 6, 2016 Utah Laws 2481, 2485.

notice of the instruction to the law enforcement agency that employed the officer" and include in the notice "the written order or a description of the order allowing for the instruction," "the language of the instruction," and "the outcome of the trial." Utah Code § 77-7a-104.1(2)(c).

¶18 Because the Adverse Inference Statute became effective in May 2020, prior to the April 2021 trial in this case, Alvarado argues that Counsel performed deficiently by not requesting an adverse inference jury instruction under the Adverse Inference Statute. *See* Act of Mar. 12, 2020, ch. 404, § 2, 2020 Utah Laws 3245, 3246. In response, the State argues that because the encounter giving rise to the charges against Alvarado occurred in April 2020, a few weeks before the Adverse Inference Statute became effective, competent counsel could have reasonably concluded that the Adverse Inference Statute did not apply to this case. Thus, we first focus on Utah's rules regarding the retroactivity of statutes to determine whether not requesting an instruction under the Adverse Inference Statute in light of the timeline of this case "falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

¶19 "The courts of this state operate under a statutory bar against the retroactive application of newly codified laws." *State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829; *see also* Utah Code § 68-3-3. However, this statutory bar provides for one exception, namely, when the newly codified law "is expressly declared to be retroactive."[6] *See* Utah Code § 68-3-3. Thus, absent this exception,

---

6. Although Utah case law has also "occasionally referred to amendments clarifying statutes as an exception to the retroactivity ban," *Gressman v. State*, 2013 UT 63, ¶ 16, 323 P.3d 998 (cleaned up), any "exception" for amendments that clarify statutes has been specifically repudiated by our supreme court, *see id.*; *Waddoups v. Noorda*, 2013 UT 64, ¶ 9, 321 P.3d 1108.

"we apply the law as it exists at the time of the event regulated by the law in question." *Clark*, 2011 UT 23, ¶ 13. And this rule applies regardless of whether the law is characterized as substantive or procedural; either way, we look to the timing of the event regulated by the new law. *Id.* The event regulated differs, however, based on whether the law is substantive or procedural. *See id.* ¶¶ 13–14; *see also State v. Rodriguez-Ramirez*, 2015 UT 16, ¶ 10, 345 P.3d 1165 (characterizing "the line between substance and procedure" as "a tool for identifying the relevant 'event' being regulated by the law in question"). Our supreme court has explained this distinction:

> On matters of *substance* the parties' primary rights and duties are dictated by the law in effect at the time of their underlying primary conduct (e.g., the conduct giving rise to a criminal charge or civil claim). When it comes to the parties' *procedural* rights and responsibilities, however, the relevant underlying conduct is different: the relevant occurrence for such purposes is the underlying procedural act (e.g., filing a motion or seeking an appeal).

*Clark*, 2011 UT 23, ¶ 14; *accord Gressman v. State*, 2013 UT 63, ¶ 13, 323 P.3d 998. Therefore, the governing issue is what event is regulated by the Adverse Inference Statute, and a determination of whether the statute is substantive or procedural will aid in identifying that event.

¶20   The State argues that the event the Adverse Inference Statute is aimed at regulating is the police encounter because it imposes a "penalty" on an officer who fails to comply with the requirement to turn on his body-worn camera. This penalty, according to the State, includes both the availability of an adverse inference jury instruction and the requirement, when such an instruction is given, for the prosecutor to "send written notice of

the instruction to the law enforcement agency that employed the officer." Utah Code § 77-7a-104.1(2)(c). To underscore its argument, the State directs us to the following language from our supreme court: "We should use a common sense, functional judgment about whether the new provision attaches new legal consequences to events completed before its enactment. This judgment should be informed and guided by familiar considerations of fair notice, reasonable reliance, and settled expectations." *Goebel v. Salt Lake City S. R.R. Co.*, 2004 UT 80, ¶ 39, 104 P.3d 1185 (cleaned up).

¶21 We disagree that the event the Adverse Inference Statute regulates is the relevant police encounter. Although the Adverse Inference Statute may create an incentive for law enforcement officers to comply with the statutory duty to activate their body-worn cameras prior to law enforcement encounters, its enactment did not create or alter that duty, and it inflicts no direct penalty on any officer who fails to comply with that duty. Moreover, while we agree that we must consider whether the new provision attaches new legal consequences to events completed before its enactment and be guided in that judgment by considerations of fair notice, reasonable reliance, and settled expectations, such considerations do not aid the State's argument in this case. Given the clear directive in Utah Code section 77-7a-104, which existed on the night of the police encounter here, Patrol Officer had fair notice of the requirement to turn on his body-worn camera and should not have had any settled expectation that he was allowed to disregard that requirement simply because no procedural consequence for such disregard existed at the time.

¶22 The Adverse Inference Statute does not affect a defendant's substantive rights that arise at the time of the conduct for which the defendant is charged, such as the substantive elements of the offense or the sentence for the offense. Rather, the Adverse Inference Statute creates a procedural right for certain defendants to be able to request an adverse inference jury instruction during

trial, *cf. Nixdorf v. Hicken*, 612 P.2d 348, 352 (Utah 1980) (explaining that "the doctrine of res ipsa loquitur," which "establishes an inference of negligence," is "a procedural rather than substantive rule of law"), and a procedural obligation on prosecutors to provide notice to law enforcement after an adverse inference instruction is given. Therefore, the events it regulates are the trial and the post-trial sending of notice. Accordingly, the statute, having been enacted over a year before the trial in this case, was applicable here, and we are unconvinced that counsel rendering adequate professional assistance could have reasonably concluded otherwise.

¶23    Furthermore, we agree with Alvarado that there is a high likelihood that the trial court would have given the adverse inference jury instruction if Counsel had requested it.

> A court presiding over a jury trial may provide an adverse inference instruction if the defendant seeking the adverse inference instruction establishes by a preponderance of the evidence that:
>
> > (i) an officer intentionally or, with reckless disregard of a requirement of Section 77-7a-104, failed to comply with a requirement of Section 77-7a-104; and
> >
> > (ii) the officer's failure to comply with the requirement of Section 77-7a-104 is reasonably likely to affect the outcome of the defendant's trial.

Utah Code § 77-7a-104.1(2)(a). We think it likely that the trial court would have agreed both that Alvarado had established by a preponderance of the evidence that Patrol Officer at least recklessly disregarded the requirement to turn on his body-worn camera when he failed to turn it on as he activated his patrol

vehicle lights and attempted to initiate a traffic stop[7] and that an adverse inference jury instruction would be reasonably likely to have an impact on the jury's decision.

¶24 Although the giving of the adverse inference jury instruction is at the trial court's discretion, *see id.* ("A court . . . *may* provide an adverse inference instruction . . . ." (emphasis added)), the Adverse Inference Statute gives the trial court the following guidance for making that determination:

> In considering whether to include an adverse inference instruction . . . , the court shall consider:
>
> (i) the degree of prejudice to the defendant as a result of the officer's failure to comply with Section 77-7a-104;
>
> (ii) the materiality and importance of the missing evidence in relation to the case as a whole;
>
> (iii) the strength of the remaining evidence;
>
> (iv) the degree of fault on behalf of the officer described in Subsection (2)(a)(i) or the law enforcement agency employing the officer, including whether evidence supports that the officer or the law enforcement agency displays a

---

7. Patrol Officer was seated in his stationary vehicle when he made the decision to initiate a police encounter with the driver of Alvarado's truck and was able to activate his emergency lights before pursuing the truck. Given the facts of this case, he should have had no difficulty also activating his body-worn camera at that time.

pattern of intentional or reckless disregard of the requirements of Section 77-7a-104; and

(v) other considerations the court determines are relevant to ensure just adjudication and due process.

*Id.* § 77-7a-104.1(2)(b). Considering these factors, the circumstances of this case weighed heavily in favor of giving an adverse inference jury instruction. The fleeing by vehicle charge required evidence that Alvarado was the driver of the truck at the time Patrol Officer tried to initiate a traffic stop. The only direct evidence the State presented on this point was the testimony of Patrol Officer that a person matching Alvarado's general description had exited from the driver's side of the vehicle before fleeing on foot. But Alvarado presented Friend's testimony directly to the contrary—that Alvarado was only a passenger in his truck that evening. Thus, a recording by Patrol Officer's body-worn camera was crucial as it would have shown which witness was correct and whether Alvarado was driving his truck that night.

¶25    We also do not agree with the State that the remaining evidence was considerably strong in showing that Alvarado was driving his truck that night. On this point, the State highlights Backup Officer's testimony that while stationed outside Alvarado's hospital room he heard Alvarado say, "[Y]ou guys are lucky that I pulled over or else you would have never caught me." Even crediting Backup Officer's credibility, this statement could conceivably be interpreted as mere drunken bravado. The State also points to Alvarado's registration as the owner of the truck and his being found near the scene. But this evidence is also consistent with Alvarado's version of events—that the truck was his and that he was riding as a passenger in it. Finally, the State points to Alvarado's drunkenness and argues that he had a stronger motive to flee if it was to avoid prosecution for drunk

driving. Yet this argument overly discounts the plausibility of a drunken companion's impulse to flee the scene of criminal conduct when police apprehension is imminent. As a whole, the evidence pointing toward Alvarado as the driver that night is simply not so strong that the trial court was likely to decide that it weighed against giving a requested adverse inference jury instruction.

¶26    Therefore, considering the importance of body-worn camera footage of the police encounter and the relative weakness of the remaining available evidence in support of the State's case, we think the trial court would very likely have exercised its discretion to provide the adverse inference jury instruction had it been requested to do so.

¶27    Finally, as to the issue of prejudice, where the only direct evidence of whether Alvarado was driving his truck was the conflicting testimony of Patrol Officer and Friend, the impact of a jury instruction specifically permitting an adverse inference against Patrol Officer would likely have been significant. This is all the more true considering the arguments presented by the State at trial. The State suggested that Patrol Officer should be believed over Friend because Patrol Officer had "no bias" and "no incentive to come in here and lie," while Friend did have "an incentive" to lie due to her relationship with Alvarado. The State also argued that body-worn camera footage is "just not something that exists all the time" and that the lack of it was "not relevant." Thus, had the jury been informed that Patrol Officer failed to comply with a statutory requirement when he failed to activate his body-worn camera and that this failure could "give rise to an adverse inference against" him, we think there is a reasonable probability that the jury would have weighed the competing testimony differently and acquitted Alvarado on the fleeing by vehicle charge. In other words, our confidence in the verdict is undermined. *See generally State v. Thompson*, 2014 UT App 14, ¶ 73, 318 P.3d 1221 ("[C]ourts are more likely to reverse a jury verdict

if the pivotal issue at trial was credibility of the witnesses and the errors went to that central issue.").

¶28    Because the Adverse Inference Statute was in effect at the time of trial and regulated trial conduct, because the trial court would likely have given an adverse inference jury instruction if it had been asked to do so, and because there is a reasonable probability that such an instruction would have changed the outcome of this case, we conclude that Alvarado received ineffective assistance of counsel when Counsel failed to request the adverse inference jury instruction. We therefore reverse Alvarado's conviction on the fleeing by vehicle charge and remand to the trial court for a new trial on that charge.

## II. Jury Instructions Setting Forth the Charged Crimes

¶29    Alvarado also argues that the jury instructions incorrectly instructed the jury on each of the two charges and that Counsel was ineffective in failing to correct those instructions. We address each charge in turn.

### A.    Fleeing by Vehicle

¶30    We have, in Part I, already reversed Alvarado's conviction on the fleeing by vehicle charge and therefore need not address his challenge to the related jury instruction. However, we take the opportunity to provide some limited direction on the matter as it may be useful upon remand. *See State v. Ogden*, 2018 UT 8, ¶ 49, 416 P.3d 1132 ("Although it is unnecessary to our decision, we retain the authority to reach issues when we believe our analysis could prove helpful on remand.").

¶31    The statutory language underlying the fleeing by vehicle charge is as follows: "An operator who receives a visual or audible signal from a law enforcement officer to bring the vehicle to a stop may not . . . attempt to flee or elude a law enforcement officer by vehicle or other means." Utah Code § 41-6a-210(1)(a). And Jury

Instruction 42 provided that for a conviction on the fleeing by vehicle count, the jury must "find beyond a reasonable doubt" that Alvarado "[d]id, as an operator [of] a motor vehicle who received a visual or audible signal from a law enforcement officer, fail to bring the vehicle to a stop" and did "[a]ttempt to flee or elude a law enforcement officer by vehicle or other means."

¶32    Although that jury instruction closely tracks the statutory language, it fails to follow prior direction from our supreme court regarding jury instructions for this crime. In *State v. Bird*, 2015 UT 7, 345 P.3d 1141, the court stated that "the terms 'receive' and 'attempt,' which are contained in the statutory language, indicate that this crime includes some level of mental appreciation" but that "we cannot assume that the jury understood the mens rea implications of these terms." *Id.* ¶¶ 18–19. The court therefore determined that further jury instruction is necessary regarding the mens rea requirements of this crime, *id.* ¶ 19, specifically, instruction that the term "receive" requires a knowing mens rea, *id.* ¶ 20, and the term "attempt" requires an intentional mens rea, *id.* ¶ 23.

¶33    Thus, as guidance upon remand, we reiterate the direction from *Bird*, as applied here:

> If the State recharges [Alvarado], we direct the trial court to instruct the jury that [Alvarado] must have knowingly 'received a visual or audible signal from a police officer' and must have intended 'to flee or elude a peace officer.' And the trial court should also include an instruction defining the knowing and intentional mental states.

*Id.* ¶ 26.

B.     Fleeing on Foot

¶34     The Utah Code defines the crime of fleeing on foot as follows: "A person is guilty of a class A misdemeanor who flees from or otherwise attempts to elude a peace officer: (1) after the officer has issued a verbal or visual command to stop; (2) for the purpose of avoiding arrest; and (3) by any means other than a violation of [the fleeing by vehicle statute]." Utah Code § 76-8-305.5. And Jury Instruction 43 stated that to convict on this count, the jury must "find beyond a reasonable doubt" that Alvarado "[d]id knowingly, intentionally or recklessly . . . [f]lee from or otherwise attempt to elude a peace officer . . . [a]fter the officer issued a verbal or visual command to stop . . . [f]or the purpose of avoiding arrest . . . [b]y any means other than the operation of a vehicle."

¶35     Alvarado argues that, because the fleeing by vehicle statute and the fleeing on foot statute are significantly similar and deal with the same subject, the guidance from *Bird* is applicable to this crime as well, that is, that the "attempt to elude" language in the fleeing on foot statute implies an intentional mens rea. Therefore, argues Alvarado, the jury instruction on the fleeing on foot charge was incorrect by instead providing a mens rea element that included the lesser mens rea options of "knowingly" and "recklessly," and Counsel's failure to object to the instruction amounted to deficient performance.

¶36     But even assuming, without deciding, that Alvarado is correct regarding the application of *Bird*'s reasoning to the crime of fleeing on foot, we still "must determine whether there is a reasonable probability the jury would not have convicted the defendant if the jury instructions had been correct." *State v. Grunwald*, 2020 UT 40, ¶ 22, 478 P.3d 1. And we see no reasonable probability that the verdict on this charge would have been different had the jury been given Alvarado's "corrected" instruction. Under the facts of this case, we see no support for a

finding that Alvarado's fleeing on foot was only "knowing" or "reckless," but not "intentional," where he came speeding into the trailer park cul-de-sac (either as the driver or as the passenger), immediately exited the truck, and took off running—not running to any house or specific destination, but just running away from the truck—as Patrol Officer came close behind with his lights activated. Thus, Alvarado was not prejudiced even if the instruction was incorrect and Counsel performed deficiently by not objecting to it.

¶37    Alvarado also raises an issue with Jury Instruction 33, which, in part, stated: "A defendant's 'mental state' is not the same as 'motive.' Motive is why a person does something. Motive is not an element of the crime(s) charged in this case. As a result, the prosecutor does not have to prove why the defendant acted (or failed to act)." He argues that this instruction would have indicated to the jury that the fleeing on foot charge did not require a finding that the fleeing was "[f]or the purpose of avoiding arrest," despite that being a listed requirement in Jury Instruction 43.

¶38    But again, even assuming error in the instruction and deficient performance in Counsel's not objecting, we similarly do not see that the facts would support a conclusion that Alvarado fled the scene for any purpose other than to avoid arrest. We think there is no reasonable probability that the jury would have determined that Alvarado was fleeing for some other reason than to avoid arrest when his truck had been speeding down the street, the vehicle came to a quick stop, and Alvarado jumped out of the truck and ran away, with police close behind.

¶39    Thus, under the facts of this case, we are not convinced that any objectionable parts of Jury Instruction 33 or Jury Instruction 43 were such as to undermine our confidence in the verdict as to the fleeing on foot charge. Because of this lack of prejudice, we

reject this claim of ineffective assistance of counsel and affirm Alvarado's conviction as to this charge.[8]

---

8. Alvarado also makes an argument of cumulative error. However, this doctrine is inapplicable in this case. As to the fleeing by vehicle charge, we have already reversed that conviction based on a single claim of ineffective assistance of counsel. And as to the fleeing on foot charge, the cumulative error doctrine is not applicable because only one error was alleged related to that charge. *State v. Martinez-Castellanos*, 2018 UT 46, ¶ 39, 428 P.3d 1038 ("'Cumulative error' refers to a number of errors which prejudice a defendant's right to a fair trial. It is used when a single error may not constitute grounds for reversal, but many errors, when taken collectively, do." (cleaned up)).

Alvarado does, however, seem to suggest within his cumulative error argument that Counsel additionally rendered ineffective assistance because he "came to trial without even knowing all the charges against his client." Specifically, Alvarado argues that "Counsel did not know about [the fleeing on foot charge] until after the State rested." But the one exchange cited by Alvarado in support of this assertion does not clearly indicate that Counsel was mistaken as to the charges against Alvarado. Instead, it seems Counsel may have recognized that the initial Information was incorrect in referencing a statute from the State Boating Act but may not have recognized that the State had already made the necessary amendment to the Information. The State explained to Counsel that someone "had inadvertently put the wrong statute in" the original Information but that it had since been fixed and that the second charge "had always been a fleeing on foot" charge. Counsel responded, "I saw that, but . . . there's been some . . . difficulties in getting those amended Informations." We are not convinced from this exchange that Counsel was operating off of an incorrect understanding of the charges as he represented Alvarado at trial. *See State v. Hards*, 2015 UT App 42,

(continued…)

CONCLUSION

¶40   Alvarado received ineffective assistance of counsel because Counsel did not request an adverse inference jury instruction that the trial court likely would have given and that would have created a reasonable probability of a more favorable result for Alvarado on the fleeing by vehicle charge. We therefore reverse and remand for a new trial on that charge. However, as to the fleeing on foot charge, we see no prejudice stemming from any of the alleged errors in the jury instructions, and we therefore affirm Alvarado's conviction as to this charge.

———————

¶ 19, 345 P.3d 769 ("Proof of ineffective assistance of counsel must be a demonstrable reality and not a speculative matter." (cleaned up)).

At any rate, even had Alvarado convinced us that Counsel was unaware of the correct charges against his client, Alvarado asserts no specific additional claims of prejudice tied to this alleged misunderstanding. He claims only that this purported misunderstanding led to the primary errors he alleges (the failure to request an adverse inference jury instruction and the failure to ensure the jury instructions correctly stated the mens rea elements for each crime) and that, had Counsel been better prepared, "he could have introduced additional evidence showing [Alvarado] was too intoxicated to form the mens rea required for both charges." But Alvarado makes no effort to identify what that available "additional evidence" would have been, so we are unable to assess whether any additional prejudice resulted from a failure to present that evidence. Thus, this additional suggestion of ineffective assistance is also unavailing.